## OLIM ET AL. *v.* WAKINEKONA

No. 81–1581.   Argued January 19, 1983—Decided April 26, 1983

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in Part I of which STEVENS, J., joined, *post*, p. 251.

*Michael A. Lilly*, First Deputy Attorney General of Hawaii, argued the cause for petitioners. With him on the brief was *James H. Dannenberg*, Deputy Attorney General.

*Robert Gilbert Johnston* argued the cause for respondent. With him on the brief was *Clayton C. Ikei.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alaska et al. by *Paul L. Douglas*, Attorney General of Nebraska, *J. Kirk Brown*, Assistant Attorney General, *Judith W. Rogers*, Corporation Counsel of the District of Columbia, and the Attorneys General for their respective jurisdictions as follows: *Wilson L. Condon* of Alaska, *Aviata F. Fa'alevao* of American Samoa, *Robert K. Corbin* of Arizona, *Jim Smith* of Florida, *David H. Leroy* of Idaho, *William J. Guste, Jr.*, of Louisiana, *William A. Allain* of Mississippi, *Michael T. Greely* of Montana, *Richard H. Bryan* of Nevada, *Irwin I. Kimmelman* of New Jersey, *Jeff Bingaman* of New Mexico, *Rufus L. Edmisten* of North Carolina, *Robert Wefald* of North Dakota, *William J. Brown* of Ohio, *Dennis J. Roberts II* of Rhode Island, *Mark V. Meierhenry* of South Dakota, *William M. Leech, Jr.*, of Tennessee, *John J. Easton* of Vermont, *Gerald L. Baliles* of Virginia, *Kenneth O. Eikenberry* of Washington, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Steven F. Freudenthal* of Wyoming; and for the Commonwealth of Massachusetts et al. by *Francis X. Bellotti*, Attorney General of Massachusetts, *Stephen R. Delinsky*, *Barbara A. H. Smith*, and *Leo J. Cushing*, Assistant Attorneys General, *Anthony Ching*, Solicitor General of Arizona, and the Attorneys General for their respective jurisdictions as follows: *Wilson L. Condon* of Alaska, *Aviata F. Fa'alevao* of American Samoa, *Robert K. Corbin* of Arizona,

JUSTICE BLACKMUN delivered the opinion of the Court.

The issue in this case is whether the transfer of a prisoner from a state prison in Hawaii to one in California implicates a liberty interest within the meaning of the Due Process Clause of the Fourteenth Amendment.

I

A

Respondent Delbert Kaahanui Wakinekona is serving a sentence of life imprisonment without the possibility of parole as a result of his murder conviction in a Hawaii state court. He also is serving sentences for various other crimes, including rape, robbery, and escape. At the Hawaii State Prison outside Honolulu, respondent was classified as a maximum security risk and placed in the maximum control unit.

Petitioner Antone Olim is the Administrator of the Hawaii State Prison. The other petitioners constituted a prison "Program Committee." On August 2, 1976, the Committee held hearings to determine the reasons for a breakdown in discipline and the failure of certain programs within the prison's maximum control unit. Inmates of the unit appeared at these hearings. The Committee singled out respondent and another inmate as troublemakers. On August 5, respondent received notice that the Committee, at a hearing to be held on August 10, would review his correctional program to determine whether his classification within the system should be changed and whether he should be transferred to another Hawaii facility or to a mainland institution.

Jim Smith of Florida, David H. Leroy of Idaho, William A. Allain of Mississippi, Michael T. Greely of Montana, Irwin I. Kimmelman of New Jersey, Jeff Bingaman of New Mexico, Rufus L. Edmisten of North Carolina, Robert O. Wefald of North Dakota, William J. Brown of Ohio, Dennis J. Roberts II of Rhode Island, Mark V. Meierhenry of South Dakota, William M. Leech, Jr., of Tennessee, John J. Easton of Vermont, Chauncey H. Browning of West Virginia, and Bronson C. La Follette of Wisconsin.

The August 10 hearing was conducted by the same persons who had presided over the hearings on August 2. Respondent retained counsel to represent him. The Committee recommended that respondent's classification as a maximum security risk be continued and that he be transferred to a prison on the mainland. He received the following explanation from the Committee:

> "The Program Committee, having reviewed your entire file, your testimony and arguments by your counsel, concluded that your control classification remains at Maximum. You are still considered a security risk in view of your escapes and subsequent convictions for serious felonies. The Committee noted the progress you made in vocational training and your expressed desire to continue in this endeavor. However your relationship with staff, who reported that you threaten and intimidate them, raises grave concerns regarding your potential for further disruptive and violent behavior. Since there is no other Maximum security prison in Hawaii which can offer you the correctional programs you require and you cannot remain at [the maximum control unit] because of impending construction of a new facility, the Program Committee recommends your transfer to an institution on the mainland." App. 7–8.

Petitioner Olim, as Administrator, accepted the Committee's recommendation, and a few days later respondent was transferred to Folsom State Prison in California.

### B

Rule IV of the Supplementary Rules and Regulations of the Corrections Division, Department of Social Services and Housing, State of Hawaii, approved in June 1976, recites that the inmate classification process is not concerned with punishment. Rather, it is intended to promote the best inter-

ests of the inmate, the State, and the prison community.[1] Paragraph 3 of Rule IV requires a hearing prior to a prison transfer involving "a grievous loss to the inmate," which the Rule defines "generally" as "a serious loss to a reasonable man." App. 21.[2] The Administrator, under ¶ 2 of the Rule, is required to establish "an impartial Program Committee" to conduct such a hearing, the Committee to be "composed of at least three members who were not actively involved in the process by which the inmate . . . was brought before the Committee." App. 20. Under ¶ 3, the Committee must give the inmate written notice of the hearing, permit him, with certain stated exceptions, to confront and cross-examine witnesses, afford him an opportunity to be heard, and apprise him of the Committee's findings. App. 21–24.[3]

The Committee is directed to make a recommendation to the Administrator, who then decides what action to take:

> "[The Administrator] may, as the final decisionmaker:
> "(a) Affirm or reverse, in whole or in part, the recommendation; or
> "(b) hold in abeyance any action he believes jeopardizes the safety, security, or welfare of the staff, inmate

---

[1] Paragraph 1 of Rule IV states:

"An inmate's . . . classification determines where he is best situated within the Corrections Division. Rather than being concerned with isolated aspects of the individual or punishment (as is the adjustment process), classification is a dynamic process which considers the individual, his history, his changing needs, the resources and facilities available to the Corrections Division, the other inmates . . . , the exigencies of the community, and any other relevant factors. It never inflicts punishment; on the contrary, even the imposition of a stricter classification is intended to be in the best interests of the individual, the State, and the community. In short, classification is a continuing evaluation of each individual to ensure that he is given the optimum placement within the Corrections Division." App. 20.

[2] Petitioners concede, "for purposes of the argument," that respondent suffered a "grievous loss" within the meaning of Rule IV when he was transferred from Hawaii to the mainland. Tr. of Oral Arg. 9, 25.

[3] Rule V provides that an inmate may retain legal counsel if his hearing concerns a "potential Interstate transfer." App. 25.

". . . , other inmates . . . , institution, or community and refer the matter back to the Program Committee for further study and recommendation." Rule IV, ¶3d(3), App. 24.

The regulations contain no standards governing the Administrator's exercise of his discretion. See *Lono* v. *Ariyoshi*, 63 Haw. 138, 144–145, 621 P. 2d 976, 980–981 (1981).

## C

Respondent filed suit under 42 U. S. C. § 1983 against petitioners as the state officials who caused his transfer. He alleged that he had been denied procedural due process because the Committee that recommended his transfer consisted of the same persons who had initiated the hearing, this being in specific violation of Rule IV, ¶2, and because the Committee was biased against him. The United States District Court for the District of Hawaii dismissed the complaint, holding that the Hawaii regulations governing prison transfers do not create a substantive liberty interest protected by the Due Process Clause. 459 F. Supp. 473 (1978).[4]

The United States Court of Appeals for the Ninth Circuit, by a divided vote, reversed. 664 F. 2d 708 (1981). It held that Hawaii had created a constitutionally protected liberty interest by promulgating Rule IV. In so doing, the court declined to follow cases from other Courts of Appeals holding that certain procedures mandated by prison transfer regulations do not create a liberty interest. See, *e. g., Cofone* v. *Manson*, 594 F. 2d 934 (CA2 1979); *Lombardo* v. *Meachum*, 548 F. 2d 13 (CA1 1977). The court reasoned that Rule IV gives Hawaii prisoners a justifiable expectation that they will not be transferred to the mainland absent a hearing, before an impartial committee, concerning the facts alleged in the

---

[4] Respondent also had alleged that the transfer violated the Hawaii Constitution and state regulations and statutes. In light of its dismissal of respondent's federal claims, the District Court declined to exercise pendent jurisdiction over these state-law claims. 459 F. Supp., at 476.

prehearing notice.[5]   Because the Court of Appeals' decision created a conflict among the Circuits, and because the case presents the further question whether the Due Process Clause in and of itself protects against interstate prison transfers, we granted certiorari.   456 U. S. 1005 (1982).

## II

In *Meachum* v. *Fano*, 427 U. S. 215 (1976), and *Montanye* v. *Haymes*, 427 U. S. 236 (1976), this Court held that an *intrastate* prison transfer does not directly implicate the Due Process Clause of the Fourteenth Amendment.   In *Meachum*, inmates at a Massachusetts medium security prison had been transferred to a maximum security prison in that Commonwealth.   In *Montanye*, a companion case, an inmate had been transferred from one maximum security New York prison to another as punishment for a breach of prison rules.   This Court rejected "the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Meachum*, 427 .U. S., at 224 (emphasis in original).   It went on to state:

"The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another.   The conviction has sufficiently extinguished the defendant's lib-

[5] Several months before the Court of Appeals handed down its decision, the Supreme Court of Hawaii had held that because Hawaii's prison regulations do not limit the Administrator's discretion to transfer prisoners to the mainland, they do not create any liberty interest.   *Lono* v. *Ariyoshi*, 63 Haw. 138, 621 P. 2d 976 (1981).   In a petition for rehearing in the present case, petitioners directed the Ninth Circuit's attention to the *Lono* decision.   See 664 F. 2d, at 714.   The Court of Appeals, however, concluded that the Hawaii court's interpretation of the regulations was not different from its own; the Hawaii court merely had reached a different result on the "federal question."   The Court of Appeals thus adhered to its resolution of the case.   *Id.*, at 714–715.

erty interest to empower the State to confine him in *any* of its prisons.

"Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.*, at 224–225 (emphasis in original).

The Court observed that, although prisoners retain a residuum of liberty, see *Wolff* v. *McDonnell*, 418 U. S. 539, 555–556 (1974), a holding that "*any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U. S., at 225 (emphasis in original).

Applying the *Meachum* and *Montanye* principles in *Vitek* v. *Jones*, 445 U. S. 480 (1980), this Court held that the transfer of an inmate from a prison to a mental hospital did implicate a liberty interest. Placement in the mental hospital was "not within the range of conditions of confinement to which a prison sentence subjects an individual," because it brought about "consequences . . . qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.*, at 493. Respondent argues that the same is true of confinement of a Hawaii prisoner on the mainland, and that *Vitek* therefore controls.

We do not agree. Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State.[6] Often, con-

---

[6] Indeed, in *Vitek* itself the Court did not read *Meachum* and *Montanye* as stating a rule applicable only to intrastate transfers. The Court stated: "In *Meachum* v. *Fano* . . . and *Montanye* v. *Haymes* . . . we held that the

finement in the inmate's home State will not be possible. A person convicted of a federal crime in a State without a federal correctional facility usually will serve his sentence in another State. Overcrowding and the need to separate particular prisoners may necessitate interstate transfers. For any number of reasons, a State may lack prison facilities capable of providing appropriate correctional programs for all offenders.

Statutes and interstate agreements recognize that, from time to time, it is necessary to transfer inmates to prisons in other States. On the federal level, 18 U. S. C. § 5003(a) authorizes the Attorney General to contract with a State for the transfer of a state prisoner to a federal prison, whether in that State or another. See *Howe* v. *Smith*, 452 U. S. 473 (1981).[7] Title 18 U. S. C. § 4002 (1976 ed. and Supp. V) permits the Attorney General to contract with any State for the placement of a federal prisoner in state custody for up to three years. Neither statute requires that the prisoner remain in the State in which he was convicted and sentenced.

On the state level, many States have statutes providing for the transfer of a state prisoner to a federal prison, *e. g.*, Haw. Rev. Stat. § 353–18 (1976), or another State's prison, *e. g.*, Alaska Stat. Ann. § 33.30.100 (1982). Corrections compacts between States, implemented by statutes, authorize incarceration of a prisoner of one State in another State's prison. See, *e. g.*, Cal. Penal Code Ann. § 11189 (West 1982) (codifying Interstate Corrections Compact); § 11190 (codifying Western Interstate Corrections Compact); Conn. Gen.

transfer of a prisoner *from one prison to another* does not infringe a protected liberty interest." 445 U. S., at 489 (emphasis added). The Court's other cases describing *Meachum* and *Montanye* also have eschewed the narrow reading respondent now proposes. See *Hewitt* v. *Helms*, 459 U. S. 460, 467–468 (1983); *Moody* v. *Daggett*, 429 U. S. 78, 88, n. 9 (1976).

[7] This statute has been invoked to transfer prisoners from Hawaii state facilities to federal prisons on the mainland. See *Anthony* v. *Wilkinson*, 637 F. 2d 1130 (CA7 1980), vacated and remanded *sub nom. Hawaii* v. *Mederios*, 453 U. S. 902 (1981).

Stat. § 18–102 (1981) (codifying New England Interstate Corrections Compact); § 18–106 (codifying Interstate Corrections Compact); Haw. Rev. Stat. § 355–1 (1976) (codifying Western Interstate Corrections Compact); Idaho Code § 20–701 (1979) (codifying Interstate Corrections Compact); Ky. Rev. Stat. § 196.610 (1982) (same). And prison regulations such as Hawaii's Rule IV anticipate that inmates sometimes will be transferred to prisons in other States.

In short, it is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced, or to be transferred to an out-of-state prison after serving a portion of his sentence in his home State. Confinement in another State, unlike confinement in a mental institution, is "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum*, 427 U. S., at 225.[8] Even when, as here, the transfer involves long distances and an ocean crossing, the confinement remains within constitutional limits. The difference between such a transfer and an intrastate or interstate transfer of

---

[8] After the decisions in *Meachum* and *Montanye*, courts almost uniformly have held that an inmate has no entitlement to remain in a prison in his home State. See *Beshaw* v. *Fenton*, 635 F. 2d 239, 246–247 (CA3 1980), cert. denied, 453 U. S. 912 (1981); *Cofone* v. *Manson*, 594 F. 2d 934, 937, n. 4 (CA2 1979); *Sisbarro* v. *Warden*, 592 F. 2d 1, 3 (CA1), cert. denied, 444 U. S. 849 (1979); *Fletcher* v. *Warden*, 467 F. Supp. 777, 779–780 (Kan. 1979); *Curry-Bey* v. *Jackson*, 422 F. Supp. 926, 931–933 (DC 1976); *McDonnell* v. *United States Attorney General*, 420 F. Supp. 217, 220 (ED Ill. 1976); *Goodnow* v. *Perrin*, 120 N. H. 669, 671, 421 A. 2d 1008, 1010 (1980); *Girouard* v. *Hogan*, 135 Vt. 448, 449–450, 378 A. 2d 105, 106–107 (1977); *In re Young*, 95 Wash. 2d 216, 227–228, 622 P. 2d 373, 379 (1980); cf. *Fajeriak* v. *McGinnis*, 493 F. 2d 468 (CA9 1974) (pre-*Meachum* transfers from Alaska to other States); *Hillen* v. *Director of Department of Social Services*, 455 F. 2d 510 (CA9), cert. denied, 409 U. S. 989 (1972) (pre-*Meachum* transfer from Hawaii to California). But see *In re Young*, 95 Wash. 2d, at 233, 622 P. 2d, at 382 (concurring opinion); *State ex rel. Olson* v. *Maxwell*, 259 N. W. 2d 621 (N. D. 1977); cf. *Tai* v. *Thompson*, 387 F. Supp. 912 (Haw. 1975) (pre-*Meachum* transfer).

shorter distance is a matter of degree, not of kind,[9] and *Meachum* instructs that "the determining factor is the nature of the interest involved rather than its weight." 427 U. S., at 224. The reasoning of *Meachum* and *Montanye* compels the conclusion that an interstate prison transfer, including one from Hawaii to California, does not deprive an inmate of any liberty interest protected by the Due Process Clause in and of itself.

## III

The Court of Appeals held that Hawaii's prison regulations create a constitutionally protected liberty interest. In *Meachum*, however, the State had "conferred no right on the

---

[9] Respondent's argument to the contrary is unpersuasive. The Court in *Montanye* took note that among the hardships that may result from a prison transfer are separation of the inmate from home and family, separation from inmate friends, placement in a new and possibly hostile environment, difficulty in making contact with counsel, and interruption of educational and rehabilitative programs. 427 U. S., at 241, n. 4. These are the same hardships respondent faces as a result of his transfer from Hawaii to California.

Respondent attempts to analogize his transfer to banishment in the English sense of "beyond the seas," arguing that banishment surely is not within the range of confinement justified by his sentence. But respondent in no sense has been banished; his conviction, not the transfer, deprived him of his right freely to inhabit the State. The fact that his confinement takes place outside Hawaii is merely a fortuitous consequence of the fact that he must be confined, not an additional element of his punishment. See *Girouard* v. *Hogan*, 135 Vt., at 449–450, 378 A. 2d, at 106–107. Moreover, respondent has not been exiled; he remains within the United States.

In essence, respondent's banishment argument simply restates his claim that a transfer from Hawaii to the mainland is different in kind from other transfers. As has been shown in the text, however, respondent's transfer was authorized by his conviction. A conviction, whether in Hawaii, Alaska, or one of the contiguous 48 States, empowers the State to confine the inmate in any penal institution in any State unless there is state law to the contrary or the reason for confining the inmate in a particular institution is itself constitutionally impermissible. See *Montanye*, 427 U. S., at 242; *id.*, at 244 (dissenting opinion); *Cruz* v. *Beto*, 405 U. S. 319 (1972); *Fajeriak* v. *McGinnis*, 493 F. 2d, at 470.

prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct," 427 U. S., at 226, and "ha[d] not represented that transfers [would] occur only on the occurrence of certain events," *id.*, at 228. Because the State had retained "discretion to transfer [the prisoner] for whatever reason or for no reason at all," *ibid.*, the Court found that the State had not created a constitutionally protected liberty interest. Similarly, because the state law at issue in *Montanye* "impose[d] no conditions on the discretionary power to transfer," 427 U. S., at 243, there was no basis for invoking the protections of the Due Process Clause.

These cases demonstrate that a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." *Connecticut Board of Pardons* v. *Dumschat,* 452 U. S. 458, 467 (1981) (BRENNAN, J., concurring). If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," *ibid.*, the State has not created a constitutionally protected liberty interest. See *id.*, at 466–467 (opinion of the Court); see also *Vitek* v. *Jones,* 445 U. S., at 488–491 (summarizing cases).

Hawaii's prison regulations place no substantive limitations on official discretion and thus create no liberty interest entitled to protection under the Due Process Clause. As Rule IV itself makes clear, and as the Supreme Court of Hawaii has held in *Lono* v. *Ariyoshi,* 63 Haw., at 144–145, 621 P. 2d, at 980–981, the prison Administrator's discretion to transfer an inmate is completely unfettered. No standards govern or restrict the Administrator's determination. Because the Administrator is the only decisionmaker under Rule IV, we need not decide whether the introductory para-

graph of Rule IV, see n. 1, *supra,* places any substantive limitations on the purely advisory Program Committee.[10]

The Court of Appeals thus erred in attributing significance to the fact that the prison regulations require a particular kind of hearing before the Administrator can exercise his unfettered discretion.[11]   As the United States Court of Appeals for the Seventh Circuit recently stated in *Shango* v. *Jurich,* 681 F. 2d 1091, 1100–1101 (1982), "[a] liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality."[12]   Process is not an end in itself.   Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.   See generally Simon, Liberty and Property in the Supreme Court: A Defense of *Roth* and *Perry,* 71 Calif. L. Rev. 146, 186 (1983).   If officials may transfer a prisoner "for whatever reason or for no reason at all," *Meachum,* 427 U. S., at 228, there is no such interest for process to protect. The State may choose to require procedures for reasons other than protection against deprivation of substantive

---

[10] In *Hewitt* v. *Helms,* 459 U. S. 460 (1983), unlike this case, state law limited the decisionmakers' discretion.   To the extent the dissent doubts that the Administrator's discretion under Rule IV is truly unfettered, *post,* at 258, and n. 11, it doubts the ability or authority of the Hawaii Supreme Court to construe state law.

[11] In *Meachum* itself, the Court of Appeals had interpreted the applicable regulations as entitling inmates to a pretransfer hearing, see *Fano* v. *Meachum,* 520 F. 2d 374, 379–380 (CA1 1975), but this Court held that state law created no liberty interest.

[12] Other courts agree that an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause. See, *e. g., United States* v. *Jiles,* 658 F. 2d 194, 200 (CA3 1981), cert. denied, 455 U. S. 923 (1982); *Bills* v. *Henderson,* 631 F. 2d 1287, 1298–1299 (CA6 1980); *Pugliese* v. *Nelson,* 617 F. 2d 916, 924–925 (CA2 1980); *Cofone* v. *Manson,* 594 F. 2d, at 938; *Lombardo* v. *Meachum,* 548 F. 2d 13, 14–16 (CA1 1977); *Adams* v. *Wainwright,* 512 F. Supp. 948, 953 (ND Fla. 1981); *Lono* v. *Ariyoshi,* 63 Haw., at 144–145, 621 P. 2d, at 980–981.

rights, of course,[13] but in making that choice the State does not create an independent substantive right.   See *Hewitt* v. *Helms*, 459 U. S. 460, 471 (1983).

## IV

In sum, we hold that the transfer of respondent from Hawaii to California did not implicate the Due Process Clause directly, and that Hawaii's prison regulations do not create a protected liberty interest.[14]   Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, and with whom JUSTICE STEVENS joins as to Part I, dissenting.

In my view, the transfer of respondent Delbert Kaahanui Wakinekona from a prison in Hawaii to a prison in California implicated an interest in liberty protected by the Due Process Clause of the Fourteenth Amendment.   I respectfully dissent.

## I

An inmate's liberty interest is not limited to whatever a State chooses to bestow upon him.   An inmate retains a significant residuum of constitutionally protected liberty following his incarceration independent of any state law.   As we stated in *Wolff* v. *McDonnell*, 418 U. S. 539, 555–556 (1974): "[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.   There is no iron curtain drawn between the Constitution and the prisons

---

[13] Petitioners assert that the hearings required by Rule IV not only enable the officials to gather information and thereby to exercise their discretion intelligently, but also have a therapeutic purpose: inmate participation in the decisionmaking process, it is hoped, reduces tension in the prison. See Tr. of Oral Arg. 52–53.

[14] In light of this conclusion, respondent's claim of bias in the composition of the prison Program Committee becomes irrelevant.

of this country. . . . [Prisoners] may not be deprived of life, liberty, or property without due process of law."

In determining whether a change in the conditions of imprisonment implicates a prisoner's retained liberty interest, the relevant question is whether the change constitutes a sufficiently "grievous loss" to trigger the protection of due process. *Vitek* v. *Jones,* 445 U. S. 480, 488 (1980). See *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972), citing *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring). The answer depends in part on a comparison of "the treatment of the particular prisoner with the customary, habitual treatment of the population of the prison as a whole." *Hewitt* v. *Helms,* 459 U. S. 460, 486 (1983) (STEVENS, J., dissenting). This principle was established in our decision in *Vitek,* which held that the transfer of an inmate from a prison to a mental hospital implicated a liberty interest because it brought about "consequences . . . qualitatively different from the punishment characteristically suffered by a person convicted of crime." 445 U. S., at 493. Because a significant qualitative change in the conditions of confinement is not "within the range of conditions of confinement to which a prison sentence subjects an individual," *ibid.,* such a change implicates a prisoner's protected liberty interest.

There can be little doubt that the transfer of Wakinekona from a Hawaii prison to a prison in California represents a substantial qualitative change in the conditions of his confinement. In addition to being incarcerated, which is the ordinary consequence of a criminal conviction and sentence, Wakinekona has in effect been banished from his home, a punishment historically considered to be "among the severest."[1] For an indeterminate period of time, possibly the

---

[1] 4 J. Elliott, Debates on the Federal Constitution 555 (1836). Whether it is called banishment, exile, deportation, relegation, or transportation, compelling a person "to quit a city, place, or country, for a specified period of time, or for life," has long been considered a unique and severe deprivation, and was specifically outlawed by "[t]he twelfth section of the English

rest of his life, nearly 2,500 miles of ocean will separate him from his family and friends. As a practical matter, Wakinekona may be entirely cut off from his only contacts with the outside world, just as if he had been imprisoned in an institution which prohibited visits by outsiders. Surely the isolation imposed on him by the transfer is far more drastic than that which normally accompanies imprisonment.

I cannot agree with the Court that *Meachum* v. *Fano*, 427 U. S. 215 (1976), and *Montanye* v. *Haymes*, 427 U. S. 236, 243 (1976), compel the conclusion that Wakinekona's transfer implicates no liberty interest. *Ante*, at 248. Both cases involved transfers of prisoners between institutions located within the same State in which they were convicted, and the Court expressly phrased its holdings in terms of *intra*state transfers.[2] Both decisions rested on the premise that no liberty interest is implicated by an initial decision to place a prisoner in one institution in the State rather than another. See *Meachum, supra,* at 224; *Montanye, supra,* at 243. On the basis of that premise, the Court concluded that the subsequent transfer of a prisoner to a different facility within the State likewise implicates no liberty interest. In this case, however, we cannot assume that a State's initial placement of an individual in a prison far removed from his family and residence would raise no due process questions. None of our

Habeas Corpus Act, 31 Car. II, one of the three great muniments of English liberty." *United States* v. *Ju Toy,* 198 U. S. 253, 269–270 (1905) (Brewer, J., dissenting).

[2] Thus in *Meachum* the Court stated that the State, by convicting the defendant, was "empower[ed] to confine him in any of its prisons," 427 U. S., at 224 (emphasis deleted), that a "transfer from one institution to another within the state prison system" implicated no due process interest, *id.,* at 225, and that "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose." *Ibid.* See also *Montanye,* 427 U. S., at 242 ("We held in *Meachum* v. *Fano,* that no Due Process Clause liberty interest of a duly convicted prison inmate is infringed when he is transferred from one prison to another within the State").

prior decisions has indicated that such a decision would be immune from scrutiny under the Due Process Clause.

Actual experience simply does not bear out the Court's assumptions that interstate transfers are routine and that it is "not unusual" for a prisoner "to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced." *Ante*, at 247. In Hawaii less than three percent of the state prisoners were transferred to prisons in other jurisdictions in 1979, and on a nationwide basis less than one percent of the prisoners held in state institutions were transferred to other jurisdictions.[3] Moreover, the vast majority of state prisoners are held in facilities located less than 250 miles from their homes.[4] Measured against these norms, Wakinekona's transfer to a California prison represents a punishment "qualitively different from the punishment characteristically suffered by a person convicted of crime." *Vitek* v. *Jones*, *supra*, at 493.

I therefore cannot agree that a State may transfer its prisoners at will, to any place, for any reason, without ever implicating any interest in liberty protected by the Due Process Clause.

## II

Nor can I agree with the majority's conclusion that Hawaii's prison regulations do not create a liberty interest. This Court's prior decisions establish that a liberty interest

[3] U. S. Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics—1981, Table 6.27, pp. 478–479 (T. Flanagan, D. Van Alstyne, & M. Gottfredson eds. 1982). These figures reflect "all inmates who were transferred from one State's jurisdiction to another to continue sentences already in force," and "[d]oes not include the release if [the] State does not relinquish jurisdiction." *Id.*, at 590.

[4] U. S. Dept. of Justice, Profile of State Prison Inmates: Sociodemographic Findings from the 1974 Survey of Inmates of State Correctional Facilities 1 (1979). Over 70 percent of state inmates are held in institutions located less than 250 miles from their homes.

may be "created"[5] by state laws, prison rules, regulations, or practices. State laws that impose substantive criteria which limit or guide the discretion of officials have been held to create a protected liberty interest. See, *e. g., Hewitt* v. *Helms,* 459 U. S. 460 (1983); *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1 (1979); *Wright* v. *Enomoto,* 462 F. Supp. 397 (ND Cal. 1976), summarily aff'd, 434 U. S. 1052 (1978). By contrast, a liberty interest is not created by a law which "imposes no conditions on [prison officials'] discretionary power," *Montanye, supra,* at 243, authorizes prison officials to act "for whatever reason or for no reason at all," *Meachum, supra,* at 228, or accords officials "unfettered discretion," *Connecticut Board of Pardons* v. *Dumschat,* 452 U. S. 458, 466 (1981).

The Court misapplies these principles in concluding that Hawaii's prison regulations leave prison officials with unfettered discretion to transfer inmates. *Ante,* at 249–250. Rule IV establishes a scheme under which inmates are classified upon initial placement in an institution, and must subsequently be reclassified before they can be transferred to another institution. Under the Rule the standard for classifying inmates is their "optimum placement within the Corrections Division" in light of the "best interests of the individual, the State, and the community."[6] In classifying inmates, the Program

---

[5] But see *Hewitt* v. *Helms,* 459 U. S. 460, 488 (1983) (STEVENS, J., dissenting) (Prison regulations "provide evidentiary support for the conclusion that the transfer affects a constitutionally protected interest in liberty," but they "do not *create* that interest" (emphasis in original)).

[6] Paragraph 1 of Rule IV provides:

"An inmate's/ward's classification determines where he is best situated within the Corrections Division. Rather than being concerned with isolated aspects of the individual or punishment (as is the adjustment process), classification is a dynamic process which considers the individual, his history, his changing needs, the resources and facilities available to the Corrections Division, the other inmates/wards, the exigencies of the community, and any other relevant factors. It never inflicts punishment; on

Committee may not consider punitive aims. It may consider only factors relevant to determining where the individual will be "best situated," such as "his history, his changing needs, the resources and facilities available to the Corrections Divisions, the other inmates/wards, the exigencies of the community, and any other relevant factors." Paragraph 3 of Rule IV establishes a detailed set of procedures applicable when, as in this case, the reclassification of a prisoner may lead to a transfer involving a "grievous loss," a phrase contained in the Rule itself.[7] The procedural rules are cast in mandatory language, and cover such matters as notice, access to information, hearing, confrontation and cross-examination, and the basis on which the Committee is to make its recommendation to the facility administrator.

The limitations imposed by Rule IV are at least as substantial as those found sufficient to create a liberty interest in *Hewitt* v. *Helms, supra,* decided earlier this Term. In *Hewitt* an inmate contended that his confinement in administrative custody implicated an interest in liberty protected by the Due Process Clause. State law provided that a prison official could place inmates in administrative custody "upon his assessment of the situation and the need for control," or "where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or others," and mandated certain procedures such as notice and a

---

the contrary, even the imposition of a stricter classification is intended to be in the best interests of the individual, the State, and the community. In short, classification is a continuing evaluation of each individual to ensure that he is given the optimum placement within the Corrections Division." App. 20.

[7] While the term "grievous loss" is not explicitly defined, the prison regulations treat a transfer to the mainland as a grievous loss entitling an inmate to the procedural rights established in Rule IV, ¶3. This is readily inferred from Rule IV, ¶3, which states that intrastate transfers do not involve a grievous loss, and Rule V, which permits inmates to retain counsel only in specified circumstances, one of which is a reclassification that may result in an interstate transfer. App. 25.

hearing.[8]  This Court construed the phrases "'the need for control,' or 'the threat of a serious disturbance,'" as "substantive predicates" which restricted official discretion.  *Id.*, at 472.  These restrictions, in combination with the mandatory procedural safeguards, "deman[ded] a conclusion that the State has created a protected liberty interest." *Ibid.*

Rule IV is not distinguishable in any meaningful respect from the provisions at issue in *Helms.*  The procedural requirements contained in Rule IV are, if anything, far more elaborate than those involved in *Helms*, and are likewise couched in "language of an unmistakably mandatory character." *Id.*, at 471.  Moreover, Rule IV, to no less an extent than the state law at issue in *Helms*, imposes substantive criteria restricting official discretion.  In *Helms* this Court held that a statutory phrase such as "the need for control" constituted a limitation on the discretion of prison officials to place inmates in administrative custody.  In my view Rule IV, which states that transfers are intended to ensure an inmate's "optimum placement" in accordance with considerations which include "his changing needs [and] the resources and facilities available to the Corrections Division," also restricts official discretion in ordering transfers.[9]

The Court suggests that, even if the Program Committee does not have unlimited discretion in making recommendations for classifications and transfers, this cannot give rise to a state-created liberty interest because the prison Administrator retains "completely unfettered" "discretion to transfer

---

[8] See 459 U. S., at 470–471, n. 6.

[9] See also *Wright* v. *Enomoto*, 462 F. Supp. 397 (ND Cal. 1976), summarily aff'd, 434 U. S. 1052 (1978).  In that case, the District Court held that the language of a prison *policy statement*, stating that "[i]nmates may be segregated for medical, psychiatric, disciplinary, or administrative reasons," 462 F. Supp., at 403, was sufficient to create a protected expectation that an inmate would not be segregated for arbitrary reasons.  See also *Bills* v. *Henderson*, 631 F. 2d 1287, 1293 (CA6 1980), cert. denied, 449 U. S. 1093 (1981); *Winsett* v. *McGinnes*, 617 F. 2d 996, 107 (CA3 1980) (en banc).

an inmate," *ante*, at 249. I disagree. Rule IV, ¶3(d)(3), provides for review by the prison Administrator of recommendations forwarded to him by the Program Committee.[10] Even if this provision must be construed as authorizing the Administrator to transfer a prisoner for wholly arbitrary reasons,[11] that mere possibility does not defeat the protectible expectation otherwise created by Hawaii's reclassification and transfer scheme that transfers will take place only if required to ensure an inmate's optimum placement. In *Helms* a prison regulation also left open the possibility that the Superintendent could decide, for any reason or no reason at all, whether an inmate should be confined in administrative custody.[12] This Court nevertheless held that the state scheme as a whole created an interest in liberty protected by the Due Process Clause. 459 U. S., at 471–472. *Helms* thus necessarily rejects the view that state laws which impose substantive

---

[10] Rule IV, ¶3(d)(3), provides:
"The facility administrator will, within a reasonable period of time, review the Program Committee's recommendation. He may, as the final decisionmaker:
"(a) Affirm or reverse, in whole or in part, the recommendation; or
"(b) hold in abeyance any action he believes jeopardizes the safety, security, or welfare of the staff, inmate/ward, other inmates/wards, institution, or community and refer the matter back to the Program Committee for further study and recommendation." App. 21.

[11] I doubt that Rule IV would be construed to permit the Administrator to order a transfer for punitive reasons, since Rule IV expressly disallows punitive transfers.

[12] That provision stated: "All decisions of the Program Review Committee shall be reviewed by the Superintendent for his sustaining the decision or amending or reversing the decision in favor of the inmate." Pennsylvania Bureau of Correction Administrative Directive BC–ADM 801, Rule III(H)(7). App. to Brief for Respondent in *Hewitt* v. *Helms*, O. T. 1982, No. 81–638, p. 12a. Because an inmate could be confined in administrative custody only if the Program Review Committee determined that such confinement is and continues to be "appropriate," *id.*, at 18a, the Superintendent in *Helms* was the "decisionmaker," *ante*, at 249–250, who determined whether inmates would be held in administrative custody.

limitations and elaborate procedural requirements on official conduct create no liberty interest solely because there remains the possibility that an official will act in an arbitrary manner at the end of the process.[13]

For the foregoing reasons, I dissent.

---

[13] This view was also implicitly rejected in *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1 (1979). The Court held that the Nebraska statute governing the decision whether or not to grant parole created a "protectible entitlement," *id.*, at 12, even though the statute, which listed a number of factors to be considered in the parole decision, also authorized the Parole Board to deny parole on the basis of "[a]ny other factors the board determines to be relevant." *Id.*, at 18.

To the extent that *Lono* v. *Ariyoshi*, 63 Haw. 138, 144–145, 621 P. 2d 976, 980–981 (1981), on which the majority relies, *ante*, at 249, suggests that no liberty interest is created as state law has not entirely eliminated the possibility of arbitrary action, it is inconsistent with both *Helms* and *Greenholtz*.