**Carrie L. CHANDLER, individually and on behalf of all other persons similarly situated, Plaintiff,**

**v.**

**Elaine A. LORD, individually, and in her official capacity as Deputy Superintendent of the Bedford Hills Correctional Facility, Bedford Hills, New York, Defendant.**

**No. 84 Civ. 4024 (RWS).**

United States District Court, S.D. New York.

Jan. 23, 1985.

Carrie L. Chandler, pro se.

Robert Abrams, Atty. Gen., State of New York, New York City (Howard L. Zwickel, Frederic L. Lieberman, Asst. Attys. Gen., New York City, of counsel), for defendant.

## OPINION

SWEET, District Judge.

This action, brought by *pro se* prisoner Carrie Chandler ("Chandler") pursuant to 42 U.S.C. § 1983, alleges a violation of Chandler's constitutionally guaranteed right to due process as a result of her being transferred from the "honor" floor to "general prison population" without a hearing. Elaine Lord ("Lord"), Superintendent of Bedford Correctional Facility ("Bedford") has moved for summary judgment, arguing that no liberty interest at-

taches to continued habitation on the "honor" floor and therefore due process did not require a hearing before the transfer. The motion is granted, and the complaint is dismissed.

## Facts

The facts surrounding this case are undisputed. Chandler is an inmate at Bedford. On December 28, 1982 she was moved from the general prison population to the "honor" floor. Inmates on the honor floor have certain additional privileges, including the right to have a personal television, to make more frequent phone calls, and to remain outside their cell in the evening. Bedford officials made continued residence on the honor floor conditional on satisfying the rules regulating conduct on the floor, (see exhibit one) and the rules, issued by Bedford personnel, state that "You will be removed from the floor for any behavior which does not meet these standards.".

On September 20, 1983 Chandler received a memorandum from Lord informing Chandler that she was being placed on probation as a result of an evaluation by an honor floor correction officer. According to the memorandum, Chandler required constant reminders to remain neat, and Chandler's behavior would "be monitored over the next month to determine whether you improve. If not, you will be removed."

On February 8, 1984, Chandler received a memorandum from Lord stating that Chandler was to be removed from the honor floor for violating Department of Correctional Services Directive 4760, which limits inmate-to-inmate correspondence. The memorandum stated that Chandler was being removed from the honor floor "because of the seriousness with which we hold your action, and because it shows little effort to improve despite your less than acceptable evaluations." Chandler was removed from the honor floor and returned to the general prison population on February 17, 1984.

## Conclusions

I must first determine whether Chandler has a protected liberty interest that re-

quires that due process standards be met prior to her transfer to general prison housing. *Meachum v. Fano*, 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976). Chandler claims such a liberty interest in freedom from transfer to the general prison population from the more desirable honor floor. The due process clause itself does not make freedom from such transfer a liberty interest.

> As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. The clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.

*Montayne v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Further, in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) the Court held that the due process clause did not prevent transfer from general prison population to disciplinary or administrative segregation without a hearing.

> Respondent argues, rather weakly, that the Due Process clause implicitly creates an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters. While there is little question on the record before us that respondent's confinement added to the restraints on his freedom, we think his argument seeks to draw from the Due Process clause more than it can provide ... Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. This conclusion finds ample support in our decisions regarding parole and good time credits. Both these subjects involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms

than that at issue here, yet in *Greenholtz* and *Wolff* we held that neither situation involved an interest independently protected by the Due Process Clause. These decisions compel an identical result here. *Id.*

Chandler's alleged liberty interest therefore cannot stem directly from the due process clause. The requirement of living in the general prison population is within the sentence imposed, is not independently violative of the Constitution, and is a less egregious deprivation than being held in disciplinary segregation, freedom from which is not a liberty interest. *Hewitt, supra.*

■ A protected liberty interest may also be created by state law, however, and once such an interest is established the due process clause "insure[s] that the state-created right is not arbitrarily abrogated." *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Meachum v. Fano, supra; Hewitt, supra; Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). States can create such liberty interests by statute or regulation, although the Supreme Court has cautioned that in the absence of "unmistakenly mandatory" language, the state-created interest will not be interpreted as a liberty interest. "The creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a state embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while states that choose not to adopt such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the state chose to require." *Hewitt v. Helms*, 103 S.Ct. at 871. In *Olim, supra*, moreover, the Court held that "a state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the state's deci-

sionmakers.'" *Olim, supra,* 103 S.Ct. at 1747, *quoting Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981) (Brennan, J., concurring).

There is no foundation for establishing a state-created liberty interest against the transfer to which Chandler was subjected. Chandler concedes in her brief that "neither the Correction Law or [sic] the State of New York nor the New York Codes, Rules and Regulations, do not require that there be Privileged Housing Units at any correctional facility in this state, and the commissioner has not promulgated any published rules regarding transfer from same." [sic, plaintiff's brief at 7–8]. Moreover, in *Montayne,* analyzing New York Correctional Law, and upholding an interprison transfer with "substantially burdensome consequences" without a hearing, the Supreme Court concluded that "there is no more basis in New York law for invoking the protections of the Due Process clause than we found to be the case" in *Meachum. Montayne* at U.S. 243, 96 S.Ct. at 2547. The relevant New York statutes and regulations are unchanged since *Montayne.* Although *Montayne* involved *inter*prison transfers, it necessarily follows that there is no state created liberty interest against *intra* prison transfers with similar consequences.

Although Chandler does not do so, one might argue that the listing of honor floor rules, which concludes by stating that "You will be removed from the floor for any behavior which does not meet these standards," creates an expectation of a hearing. Such an argument must fail, for the warning attached to the honor floor rules is not even a "prodedural guideline," but is, rather, a statement of the consequences that follow from certain conduct. The Court in *Hewitt, supra,* found a liberty interest only because:

> the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, see note 6 *supra,* and that admin-

istrative segregation will not occur absent specified substantive predicates— *viz.,* "the need for control," or "the threat of a serious disturbance."

---

6. Section 95.104(b)(1) of Title 37 of the Pennsylvania Code provides that:

> An inmate who has allegedly committed a Class 1 Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title.

Section 95.103(b)(3) of the same title provides:

> An inmate may be temporarily confined to Close of Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days.

*Id.* 103 S.Ct. at 871.

■ The absence of any statutory or regulatory restraints upon the discretion of New York prison officials in transferring inmates from the "honor" floor to the general prison population makes it impossible to find a liberty interest in avoiding such transfers without a hearing. Chandler's complaint therefore fails to state a claim upon which relief can be granted, and the motion to dismiss is granted. The clerk is

directed to enter judgment dismissing the complaint.

**IT IS SO ORDERED.**

## HONOR FLOOR

### RULES AND REGULATIONS

1. No yelling, no loud or boisterous conduct. No running up and down corridors.
2. TV's must not be able to be heard outside of your cell.
3. Radios and tape players can be used only with headphones, or earphones, at all times, unless otherwise approved for a group activity by the Executive Team.
4. No loitering in the corridors or kitchen area at any time.
5. No entering another inmate's room on your corridor without permission from the occupant.
6. No behavior that would be disruptive to officers on duty will be tolerated.
7. Your language and manner of approach to both inmates and staff must be courteous. Profanity and rudeness will not be tolerated.
8. Typewriters cannot be used after 10:00 PM in your cell. They must be used in the Rec Area.
9. Ironing, showers, hair dryers, curling irons, cannot be used after 10:00 PM. The kitchen can only be used after 10:00 PM for toast, popcorn, or boiling water.
10. No hanging out in the kitchen at any time. It is to be used for cooking and not as a meeting area.
11. The study room is for quiet use for educational or religious purposes.
12. There is no singing in the cells, corridor area, or recreation area.
13. Musical instruments are not to be played on the floor.
14. Cell inspections can and will be held at any time. Each woman is responsible for maintaining standards of neatness and cleanliness.
15. It is your responsibility as an Honor inmate to participate in cleaning activities on the floor over and above your regular assignment.
16. All other rules and regulations of the facility are to be upheld unless an exception has been made for the Honor Floor.

You will be removed from the floor for any behavior which does not meet these standards.

_____  _____
Date                        Signature