Bruce Peter HAZEN; Thomas Wright; Walter Smith; Dale Davis; Robert Lee Kearn; Willie Lloyd; Plaintiffs,

Albert W. Ware; Intervenor–Appellant,

Arthur Alan Poyner; Rick Dean Foster; George Segler; David Streets; Bryan Kirby Barrett; Jerry Mark; Bill Davis; Tim Florea; Herbert Schnee, Intervenors,

v.

Michael V. REAGEN, as Commissioner of Social Services of State of Iowa; David Scurr, as Warden of Iowa State Penitentiary, Defendants–Appellees.

No. 93–1294.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1993.

Decided Feb. 16, 1994.

Counsel who presented argument on behalf of the appellee was Layne M. Lindebak, Assistant Attorney General, Des Moines, Iowa.

Before LOKEN, Circuit Judge, CAMPBELL, Senior Circuit Judge,* and HANSEN, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Appellant Albert Ware was a prisoner in the Iowa State Penitentiary ("ISP") when he was transferred under the Interstate Corrections Compact to a Florida prison. Ware and other inmates at the ISP moved in the United States District Court for the Southern District of Iowa[1] for an Order to Show Cause why the prison officials should not be held in contempt of a consent decree in effect at the prison. Ware asserted that his transfer was intended to frustrate his nomination to a position on an elected inmate advisory council at ISP. The district court denied the motion. Ware appeals, and we affirm.

## I.

In 1975, prisoners at the ISP filed a class action in the district court alleging that policies and practices at the prison violated the Fourteenth Amendment to the United States Constitution. The parties in 1981 entered into a settlement agreement, and in 1982 the district court approved the agreement, giving it the force and effect of a consent decree ("the Decree").

One of the provisions of the Decree was the formation of an elected inmate council, the Prisoners' Advisory Council ("PAC"), that would "meet regularly with the prison administration to discuss programs and inmate living concerns." The PAC was to consist of a prisoner representative of each living unit at the prison and of at least three representatives of recognized self-help organizations and the like. Otherwise, the Decree contained little to describe the PAC's organizational structure and means of opera-

Counsel who presented argument on behalf of the appellant was Patricia M. Hulting, Des Moines, Iowa.

* The HONORABLE LEVIN H. CAMPBELL, Senior United States Circuit Judge for the First Circuit, sitting by designation.

1. The Honorable Charles R. Wolle, Chief Judge, United States District Court for the Southern District of Iowa.

tion, leaving these matters to be "worked out by the parties."

The prison administration and the class subsequently agreed on Articles of Incorporation and Bylaws for the PAC. Under the Articles of Incorporation, the PAC was to have the authority to "develop, enact and implement" bylaws, with such power being "subject to the discretionary power of the Warden." Pursuant to such power, the Warden has the "final authority to approve or disapprove" any amendment. Bylaw BL–111:03.

Under the bylaws agreed to by the parties, one of the PAC members is to be from the "honor lifers," prisoners serving life sentences who have earned special privileges because of good behavior. Elections for the honor lifer member, along with the other representatives, are to be held every nine months. Before each election, a prison official is to determine that the nominees are eligible and willing to serve on the PAC. To be eligible, according to the bylaws, an inmate must live in the unit he represents and cannot have received a conviction of a major disciplinary report within a ninety day period before the election.[2] Bylaw BL–102:07.

If no nominee is both eligible and willing to serve, the position remains vacant until such time as it can be filled through either election or appointment. A prison official, entitled the "PAC staff liaison," is responsible for choosing the method of selection. Bylaw BL–103:02c; Bylaw BL–103:07. Similarly, if a vacancy in the honor lifer position arises before the expiration of the nine-month term of office, the PAC "may fill the vacancy by election or appointment at the discretion of the PAC staff liaison." Bylaw BL–101:04.

Under the Decree, the parties agreed that the district court would "have broad equitable authority to consider the purposes of the agreement, ... the security and order of the institution, as well as inmate rights, in reviewing disputes as to the agreement and its development and implementation." In its approval of the settlement, the district court

explained that the prison had "consented to a greater than usual post-settlement supervisory role for the Court, which will allow closer and more frequent judicial security of the good and bad faith displayed by the parties in the performance" of the Decree.

## II.

In early August, 1991, the PAC honor lifer representative, an inmate named David Streets, resigned prior to the expiration of his term. There was no alternate for the position, and the PAC chairman, an inmate named Arthur Poyner, wrote a memo to Deputy Warden John Henry, the PAC liaison, nominating Ware to the vacant slot. Ware had earlier been the chairman of the PAC, but had resigned when he earned the status of honor lifer. Ware was active in inmate programs during his imprisonment and wrote a column for the PAC newsletter.

Deputy Warden Henry did not accept Ware's nomination and instead asked Poyner to submit the names of three inmates from which the administration could choose. Poyner did so, proposing Ware and two others. Both of the other two nominees, however, declined the position. Ware indicated interest in serving, but prison officials refused to appoint him, as they apparently believed that Ware was trying to intimidate his way onto the PAC.

On August 19, Poyner wrote to then-Warden Crispus Nix complaining that the prison was acting inconsistently with the Decree by interfering in the replacement of a PAC representative. Poyner stated his "demand" that Ware be appointed. Responding to Poyner on August 26, Warden Nix called his demand "outlandish," and said that under the bylaws Poyner should allow the appointment to "rest with the proper authority."

Meanwhile, also in mid-August, Warden Nix learned from the Florida Department of Corrections that Florida would accept two Iowa inmates under the Interstate Correc-

---

2. In addition, nominees for positions representing disciplinary units within the prison are reviewed by the Warden, who can remove from candidacy any such nominee who could pose a security risk on the PAC. Bylaw BL–103:03b. As Ware was not housed in a disciplinary unit, this bylaw was not applicable in this case.

924

tions Compact, Iowa having previously taken two Florida inmates.

On September 3, 1991, the Deputy Warden for Programs at the ISP sent a request to the Department of Corrections that Ware be one of the inmates transferred to Florida. The transfer was based, according to the request, "primarily on [Ware's] manipulation of the system." The request stated that the transfer would "show him that it can happen to him as well as others, and give him an opportunity to change his attitude and direction." As Ware was serving a life sentence, he would "no doubt [ ] return to ISP," but, according to the writer, presumably with a "better attitude than he now possesses."

The relationship between prison officials and the PAC deteriorated. On September 4, Poyner wrote prison officials objecting to a raise in the surcharge at the prisoner's canteen. On September 9, the Warden decided that "because of the caustic correspondence of the PAC," he would not "make a decision as to who would be on the PAC" for another 60 days. On September 18, Poyner forwarded to officials a letter from Ware also objecting to the canteen surcharge. On September 24, Warden Nix responded to Ware calling him and Poyner "typical inmate bureaucrats" who were "probably just where they belong[ed]." Nix further stated that Ware and Poyner should expect no further reply since he did "not intend to respond on this subject any more." On October 9, Poyner wrote to the Governor of Iowa and the Director of the Department of Corrections, asserting that the "relationship between the ISP administration and the PAC has deteriorated to the point where outside intervention is called for."

On November 1, 1991, prison officials transferred Ware to a Florida prison. After his transfer, officials allowed an election to be held among the honor lifers to select a PAC representative.

The inmates, as the plaintiff class in the original class action, moved in the district court for an order of contempt, alleging that prison officials had violated the Decree. They contended that Ware was involuntarily transferred for the purpose of disrupting the effectiveness of the PAC and in retaliation

for his and others' complaints that prison officials were failing to abide by the Decree. Ware's transfer was also alleged to have violated his and other inmates' First Amendment free speech rights. As a further contempt of the Decree, the inmates cited the prison administration's delay in permitting an honor lifer representative to be selected.

After hearing, the district court found that the prison officials reasonably believed Ware to be a troublesome inmate who had used intimidating tactics to persuade other inmates to allow him to serve as PAC representative. The district court concluded that the PAC bylaws did not preclude Ware's transfer, and that the bylaws, in any event, were not an integral part of the Decree. The district court also concluded that no constitutional issues were implicated by Ware's transfer. Holding that the plaintiff class had failed to prove noncompliance with a provision of the Decree by clear and convincing evidence, the district court refused to hold the prison officials in contempt.

Ware, as a member of the plaintiff class, appealed. We affirm the district court's denial of the contempt motion and its determination that Ware's transfer did not implicate rights protected by the Constitution.

### III.

Review of the denial of a contempt motion is limited to determining whether the district court abused its discretion. *Davis v. Bowen,* 894 F.2d 271 (8th Cir.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1922, 109 L.Ed.2d 286 (1990). Findings of fact may not be set aside unless demonstrated to be clearly erroneous. Fed.R.Civ.P. 52(a). The court of appeals must give "due regard" to "the opportunity of the trial court to judge of the credibility of the witnesses." *Id.*

Before a party can be held in contempt for violating a court order, he must have actual knowledge of the order and the order must be "sufficiently specific to be enforceable." *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 213 (8th Cir.1974); *see also United States v. Di Mauro,* 441 F.2d 428, 439 (8th Cir.1971); *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461 (9th Cir.

1989); *Stotler and Co. v. Able,* 870 F.2d 1158, 1163–64 (7th Cir.1989). Here Ware argues that the consent decree incorporated the requirements of the bylaws, and that, so constituted, it was "sufficiently specific to be enforceable." Ware asserts that, by stating the "precise organization, structure, responsibilities and means of operation of the [PAC] shall be worked out by the parties," the Decree expressly incorporated the bylaws within the meaning of *United States v. ITT Continental Banking Corp.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975).

As a further basis for incorporating the bylaws into the Decree, Ware points out that the parties to the Decree agreed that the court would maintain "broad equitable authority to consider the purposes of the agreement, . . . the security and order of the institution, as well as inmate rights, in reviewing disputes as to the agreement and its development and implementation." Because the bylaws help define the purposes of the consent decree, they should be regarded as integral to it, Ware suggests.

■■■■ We need not decide this legal issue, however. Even assuming, *arguendo,* that the bylaws were incorporated into the Decree, the district court did not abuse its discretion in refusing to hold the prison officials in contempt. Ware, as plaintiff, had the burden of proving a violation of the consent decree by clear and convincing evidence. *Sapanajin v. Gunter,* 857 F.2d 463, 465 (8th Cir.1988). The district court concluded that Ware did not meet this burden, finding that the prison officials had transferred Ware because they "reasonably believed he was a troublesome, manipulative inmate." The district court specifically found that Ware's transfer was not executed in order to make the PAC "less effective or less representative of inmate concerns." These findings rest on testimony of prison officials, which the district court was entitled to credit. Nothing causes us to believe that these findings are clearly erroneous.[3]

Given the court's findings, to which we must defer, Ware's argument that his trans-

fer contravened the bylaws is without merit. Ware does not pinpoint any PAC bylaw that would have prohibited his legitimate transfer to another institution, even if he had been selected as a PAC representative. The bylaws expressly declare that the Warden maintains "the authority to make decisions concerning the general conduct and deportment of the inmate members of the [PAC], in relation to all existing rules and regulations of this facility and the Department of Corrections." Bylaw BL–111:00.

■■■■ In addition to asserting that his transfer was in contempt of the Decree, Ware argues that he was transferred in retaliation for exercising his First Amendment rights. Ware correctly notes that it is impermissible to transfer an inmate in retaliation for the exercise of a constitutional right. *Goff v. Burton,* 7 F.3d 734, 737 (8th Cir. 1993); *Ponchik v. Bogan,* 929 F.2d 419, 420 (8th Cir.1991); *Murphy v. Missouri Dept. of Correction,* 769 F.2d 502, 503 (8th Cir.1985). But whatever rights the Decree conferred upon Ware and other inmates to seek and hold PAC office were not rights conferred by the Constitution.

We recognize that at least one court has declared that inmates have a First Amendment interest in seeking redress of grievances. *Wolfel v. Bates,* 707 F.2d 932 (6th Cir.1983) (inmate's right to complain and to seek redress of grievances protected by the First Amendment). *See Sprouse v. Babcock,* 870 F.2d 450 (8th Cir.1989) (citing *Wolfel* ). But even if Ware had argued pursuant to *Wolfel* that it was really his First Amendment right to complain and seek redress that was violated by the transfer, his argument would fail on the facts, as the district court found that he was transferred because of the authorities' reasonable belief that "he was a troublesome, manipulative inmate," not because he sought redress of grievances. While these matters could be interrelated, prison officials necessarily retain discretion to make, and to act upon, judgments of this nature. The district court found that "prison officials reasonably believed that Ware was a

---

3.  Appellant has not furnished a transcript of the district court hearing. The district court refused to order payment for such a transcript, and this Court denied appellant's application for payment of the costs of transcribing the hearing transcript for appeal.

troublesome inmate who used manipulative or intimidating tactics to persuade other inmates to allow him to replace David Streets as an honor lifer representative." Given this and the other findings by the court after hearing, we see no First Amendment bar to the transfer.

■ In this regard, we further note that for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred "but for" the retaliatory reason. *Goff,* 7 F.3d at 737–38. If not done in retaliation for the exercise of a protected right, a prisoner may be transferred " ' "for whatever reason or for no reason at all." ' " *Id.* at 737 (quoting *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) (quoting *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976))). This broad discretion granted to prison authorities is based on the concept that "an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, … [or] that he will be incarcerated in any particular State." *Olim,* 461 U.S. at 244, 103 S.Ct. at 1744 (footnote omitted). Given the district court's findings that Ware was transferred because of the above legitimate concerns, Ware did not meet the "but for" requirement.

■ Ware's final argument is that his transfer, and the accompanying delay in the selection of an honor lifer representative, constituted impermissible manipulation of the PAC and was, therefore, for that separate reason, in contempt of the Decree. This argument, too, is defeated by the district court's express findings to the contrary. Admittedly, prison officials appear to have decided that Ware was not to be allowed to fill the PAC vacancy even before they decided that he would be transferred. Had Ware not been transferred, it is unclear whether the bylaws or Decree would have allowed the prison officials the necessary authority to veto his selection. But that is a question neither the district court nor we need to decide. The district court, after a hearing, expressly found that the prison officials "did

not transfer [Ware] with an object of making the PAC less effective or less representative of inmate concerns." This finding is a complete answer to Ware's contempt contention, and it is not clearly erroneous.

Nor was the ensuing delay in the selection of an honor lifer representative necessarily contemptuous. One of the eligibility requirements for PAC representatives is that the inmate have at least one year remaining on his sentence "within the 'walls' of the Iowa State Penitentiary." Bylaw BL–102:02. Under the bylaws, therefore, as soon as Ware was scheduled for transfer, he may well have ceased to be eligible to serve as a PAC representative. No other honor lifer expressed any interest in serving as PAC representative. According to the bylaws, when there is no candidate both eligible and willing to serve in a PAC position, "the position shall remain vacant until such time as an appointment can be made." The court could plausibly have felt that, given Ware's manipulative behavior, an appointment or election was reasonably delayed until Ware had been transferred away from the ISP. The Decree, as earlier noted, gave the district court "broad equitable authority to consider the purposes of the agreement, … the security and order of the institution, as well as inmate rights, in reviewing disputes as to the agreement and its development and implementation."

## IV.

In conclusion, we find no clear error among the district court's findings of fact, no error of law in its rejection of plaintiff-appellant's constitutional claims, and no abuse of its discretion in denying plaintiff-appellant's motion for contempt.

*Affirmed. No costs.*