**Ricky NEWELL, Plaintiff–Appellant,**

v.

**Robert BROWN, Jr., et al.,
Defendants–Appellees.**

No. 92–1446.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 10, 1992.

Decided Dec. 11, 1992.

Rehearing and Rehearing En Banc
Denied Feb. 9, 1993.

Timothy M. Holloway (argued, briefed), Davis, Culpepper & Saroki, Detroit, MI, for plaintiff-appellant.

Linda M. Olivieri (argued, briefed), Office of the Atty. Gen., Corrections Div., Lansing, MI, for Robert Brown, Jr., Dan Bolden, David Trippett, A.J. Jackson, F. Lavigne.

Michael L. Murray, Steven R. Ross (argued, briefed), Charles Tiefer, U.S. House of Representatives, Office of the Clerk, DC, Linda M. Olivieri, Office of Atty. Gen., Corrections Div., Lansing, MI, for William Schuette.

Before: KEITH and NELSON, Circuit Judges; and LIVELY, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is an appeal from a judgment for the defendants—a congressman and various Michigan prison officials—in a civil rights action brought by a state prisoner who is serving three life sentences for murder. The plaintiff prisoner's security classification was reduced at least once during his confinement, but it was ultimately upgraded, and the plaintiff was transferred from a medium security institution to one for prisoners with higher security levels, after the daughter of one of the plaintiff's victims prevailed upon her congressman to write a letter requesting the Michigan Department of Corrections to reassign the plaintiff.

Upon *de novo* review of contested portions of a report and recommendation submitted by Magistrate Judge Lynn V. Hooe, Jr., the district court (Duggan, J.) concluded, as had the magistrate judge, that the plaintiff could not show that his reclassification and transfer represented a violation of his constitutional rights. We agree with this conclusion, and we shall affirm the district court's judgment.

I

The plaintiff, Ricky Newell, was convicted on three counts of first-degree murder in the late 1970s. He received three mandatory life sentences, and he has been incarcerated in the Michigan prison system ever since.

Although the plaintiff was originally held in "close custody," according to his complaint, his custody level was reduced to "medium" in January of 1988. He was then transferred to the Thumb Correctional Facility, a medium-security institution at Lapeer, Michigan.

In July of 1989 a local newspaper ran a story reporting, among other things, that the plaintiff had escaped from confinement twice prior to his murder convictions; that a co-defendant in the plaintiff's murder trial had confessed to shooting the three victims in the face at the plaintiff's urging; and that relatives of the victims were outraged that the plaintiff was not being kept in a maximum security prison.

Shortly after the appearance of the newspaper article, defendant Bill Schuette, who was then the Member of Congress from the Tenth Congressional District of Michigan, sent a letter to defendant Robert Brown, Jr., the Director of the Michigan Department of Corrections, in which he said this:

"One of my constituents recently brought to my attention that the convicted murderer of her mother has been transferred from the maximum-security Riverside Correctional Facility in Ionia to the medium-security Thumb Regional Correctional Facility in Lapeer. The inmate to whom I refer is Ricky N. Newell. Newell has a history of escapes, including a break from the Michigan Training Unit in Ionia, where he was serving time for armed robbery, and the Genesee County Jail. Despite his escape from the Michigan Training Unit and the subsequent additional prison time, Newell was released on 'good time' before serving his minimum sentence. It was while on parole after his release that he murdered Shirley Parvin and two others during a robbery of the Sunshine Food Store in Flushing.

It is my opinion, and I believe the opinion of the citizens of Michigan, that anyone convicted of murdering another human being in the first degree should never be transferred out of a maximum-security facility, regardless of the reason. I feel especially strong about this in Newell's case.

Bob, despite Corrections' policy, I am asking that because of the severity of Ricky Newell's crimes, and his record of prior escapes from prison, that you facilitate his immediate return to a maximum-security facility. Your attention to this matter would be greatly appreciated.

Thank you in advance for your cooperation in this matter."

Copies of the letter went to the Governor of Michigan and to defendant David Trippett, the warden of the Thumb facility.

On August 2, 1989, following a security classification hearing at which the plaintiff argued that he was not a threat to the public, the plaintiff's security level was increased from "medium" to "close." The classification hearing officers (the deputy warden and assistant deputy warden for custody, both of whom are also defendants in this action) recommended that the plaintiff's security level be increased "for the protection of the general public as [the plaintiff] would pose less of an escape risk." In conjunction with the reclassification the plaintiff was transferred to the State Prison of Southern Michigan at Jackson. There he was subsequently reclassified to a lower level, but he continued to be housed in the "close" security section of the Jackson facility.

The plaintiff commenced administrative grievance proceedings in October of 1989. His grievance was rejected at every stage. In June of 1990, however, a field investigator with the Office of Legislative Corrections Ombudsman recommended to the deputy director of the corrections department, defendant Dan Bolden, that the plaintiff be transferred to a medium custody level facility. The investigator's recommendation—which stated that "[t]he real reason [the plaintiff] was transferred appears to have been Congressman Schuette's letter and a 7/8/89 newspaper article which expressed the victim's family [sic] outrage at his TCF placement"—was not followed. The defendant was still in close custody at Jackson when he commenced his lawsuit in August of 1990.

Filed originally in the United States District Court for the Western District of Michigan, the case was transferred to the Eastern District. There, through counsel, the plaintiff filed a comprehensive amended complaint. The state defendants responded by moving for summary judgment.

Congressman Schuette moved for dismissal on jurisdictional grounds and for failure to state a claim. The plaintiff has perfected a timely appeal from an order in which the district court (a) granted the defendants' motions and (b) denied a motion by the plaintiff for leave to amend his complaint to assert claims under the Equal Protection and Bill of Attainder clauses of the Constitution.

## II

### A. The Summary Judgment in Favor of the State Defendants.

In his first amended complaint the plaintiff alleged that he had been deprived of property and/or liberty without due process of law in violation of his rights under the Fifth and Fourteenth Amendments. He also alleged that his reclassification "constitute[d] a violation of Plaintiff's Fifth and Fourteenth Amendment rights to be free from ... arbitrary and capricious decisions...."

■ No recognizable property interest has ever been specified here. The only constitutionally protected interest that could conceivably be involved in this case would be "liberty." Incarceration necessarily entails a deprivation of liberty, of course, but "a residuum of liberty" survives a prisoner's lawful incarceration despite the fact that the prisoner does not remain at liberty in the normal sense. *Olim v. Wakinekona*, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983); *Inmates of Orient Correctional Institute v. Ohio State Adult Parole Authority*, 929 F.2d 233, 235 (6th Cir.1991).

The liberty interest claimed by the plaintiff is an interest in being classified below the "close" security level and in not being transferred to a close security prison. The Due Process Clause of the Fourteenth Amendment does not itself create any such interest, of course. See *Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir.1986). State law,

not federal constitutional law, is the only possible source of a liberty interest in a particular security classification or in assignment to a particular type of state penal institution. See *Montayne v. Haymes*, 427 U.S. 236, 242–43, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), and *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). No such interest can arise, the caselaw teaches, unless the state statutes or regulations place "substantive limitations" on the discretion of the officials responsible for deciding classification and facility assignment questions, "mandating the outcome to be reached upon a finding that the substantive predicates have been met." *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989).

The plaintiff argues that Department of Corrections Rule 791.4401, as in effect at the time of his reclassification on August 2, 1989, created a liberty interest. Rule 791.-4401 had been superseded some months earlier, however, by emergency rules adopted in response to "severe inmate disciplinary problems."

Effective October 3, 1988, Subrule (1) of Emergency Rule 1 provided, as had its predecessor, that classification decisions were to be based upon the prisoner's "behavior, attitude, circumstances, and the likelihood that the trust implicit with the level of security prescribed will be honored." Subrule (1) went on to provide that

"The following factors *may* be considered in determining classification:

(a) The prisoner's need for protection.

(b) The safety of others.

(c) The protection of the general public.

(d) Prevention of escape.

(e) Maintenance of control and order."

(Emphasis supplied.)[1]

Subrule (3) of Emergency Rule 1 provided that "the prisoner shall be assigned [the

---

**1.** This language replaced a sentence that had read thus: "A prisoner *shall* be classified according to the security requirements necessary for the following:

(a) The prisoner's protection.
(b) The safety of others.
(c) The protection of the general public.
(d) Prevention of escape.

security classification that] is the least restrictive level of custody consistent with the requirements of subrule (1) of this rule." The "requirements of subrule 1," as we have seen, had been made more flexible in October of 1988, when the list of relevant factors ceased to be exclusive and consideration of the listed factors was made permissive rather than mandatory.

A policy directive adopted contemporaneously with Emergency Rule 1, PD–DWA–30.02 (Oct. 1, 1988), stated that "*the Department shall make every effort* to classify prisoners according to management and confinement requirements necessary for the safety of themselves, other prisoners and staff and protection of the general public, protection of escape, and maintenance of control and order," but the directive explicitly declared that "*there is no intrinsic right to placement at a particular level.*" (Emphasis supplied.) The policy directive went on to say that "[t]he least restrictive form of control consistent with these requirements shall be utilized consistent with available bed space." Subject to approval by the deputy director or his designee in cases involving a departure of more than one level from the security level indicated by application of prescribed screening forms, the policy directive provided that "[s]taff may classify a prisoner to a security level other than that which is indicated by completion of the initial or review screen *if it is believed that the prisoner's true confinement or management needs are not met by classification to the level indicated by the screen.*" (Emphasis supplied.)

Addressing the rules that were in effect prior to the emergency declared in October of 1988, a Michigan Court of Appeals declared in *Chivas v. Koehler,* 182 Mich.App. 467, 474, 453 N.W.2d 264, 267 (1990), that "[t]he rules did not specify what weight should be given to each factor or how they should be considered." The Michigan court therefore found that "the placement of inmates was a discretionary function." *Id.* If the placement of inmates was a discretionary function under the rules in effect

prior to October of 1988, it follows *a fortiori* that prisoner placement was a discretionary function under the less structured rules that were in effect at the time of the plaintiff's transfer to the prison at Jackson.

The district court concluded in the case at bar that rules in effect at the time of the plaintiff's transfer stopped short "of requiring that a particular result be reached upon a finding that the substantive predicates are met." Slip Opinion at 11, citing *Kentucky Department of Corrections v. Thompson,* 490 U.S. at 464, 109 S.Ct. at 1910. Because the rules "lack the requisite relevant mandatory language," the district court held, "no liberty interest protected by the Due Process Clause of the Fourteenth Amendment has been created." *Id.* We read the Michigan rules the same way. See *Wilson v. Brown,* 1991 WL 23536 at *1, 1991 U.S. App. LEXIS 3074 at *3, No. 90–1957, decided without published opinion, 927 F.2d 606 (6th Cir.1991) (Michigan "imposes no substantive limits on the discretion of prison officials to reclassify prisoners").

*Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), on which the plaintiff relies heavily, does not require a contrary reading of the Michigan rules. *Allen* held that a liberty interest in release on parole was created by a Montana statute which, absent the existence of specified conditions that would preclude parole, mandated the granting of parole upon a finding by the State Board of Pardons of a "reasonable probability that the prisoner can be released without detriment to the prisoner or the community." Montana Code Ann. § 46–23–201(1). Under Michigan's system, by contrast, prisoners were to be assigned to the least restrictive level of custody consistent with the requirements of a subrule that had been amended to give a non-exclusive listing of factors consideration of which was permissive, not mandatory—and the prison staff was explicitly authorized to place a prisoner in a security classification other than that indicated by the prescribed classification screen form "if it is believed that the pris-

(e) Maintenance of control and order." (Emphasis supplied.)

oner's true confinement or management needs are not met by classification to the level [so] indicated...." Michigan's system thus did not prescribe any objective mandatory standard comparable to that set forth in the Montana statute.

■ It may be true that the plaintiff's reclassification ought to have been approved by the deputy director or his designee,[2] and it is not clear to us whether such approval was given. What is clear, however, is that "procedural requirements alone cannot establish a liberty interest." *Beard v. Livesay*, 798 F.2d 874, 877 (6th Cir.1986). A violation of Michigan's procedural regulations could not violate the Due Process Clause absent some independent basis for finding a liberty interest that was taken away. *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Inmates of Orient Correctional Institute*, 929 F.2d at 237. No such basis has been shown here.

■ The plaintiff argues that Michigan's rules did not authorize the prison staff to take into consideration the views expressed by Congressman Schuette. This argument, however, overlooks the fact that the 1988 amendments changed the prior regulation so that the list of factors that could be considered did not purport to be exclusive. Under the amended rules, as we read them, there was nothing wrong with the prison officials giving consideration to the views expressed by Congressman Schuette. And unlike the state Senator who "demanded" the retraction of steps taken to release a convicted murderer in *Winsett v. McGinnes*, 617 F.2d 996 (3d Cir.1980) (*en banc*), *cert. denied*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), another case on which the plaintiff relies, Congressman Schuette was in no position to block the confirmation of any decisionmaker's ap-

pointment to his job. Even if the congressman had been in a position to engage in legislative reprisals, moreover, we do not believe that consideration of the possibility of such reprisals, or of an adverse public reaction to a failure to increase the plaintiff's security level, would have been foreclosed under the amended rules. As long as they do not act in ways forbidden by law, public servants are not constitutionally forbidden to listen to the voice of the people who pay their salaries.

■ The plaintiff argues, nonetheless, that his classification and transfer were "arbitrary and capricious in violation of substantive due process protections." We do not doubt that the concept of substantive due process—that "durable oxymoron," as Judge Posner has called it—continues to influence the thinking of the Supreme Court. Virtually every member of the Court has acknowledged that the Due Process Clause does have a substantive component, however difficult it may be to discern its contours. But nothing in the circumstances of the case before us suggests to us that there has been a violation of any substantive rights conferred by the Due Process Clause.

The plaintiff relies heavily on Chapter 29 (miscited in his brief as Chapter 39) of Magna Carta. Chapter 29, as quoted in the Second Part of Coke's Institutes, p. 45 (1642 ed.), reads follows:

"Nullus liber homo capiatur, vel imprisonetur, aut disseisietur de libero tenemento suo, vel libertatibus, vel liberis consuetudinibus suis, aut utlagetur, aut exuletur, aut aliquo modo destruatur, nec super eum ibimus, nec super eum mittemus, nisi per legale judicium parium suorum, vel per legem terrae. Nulli vendemus, nulli negabimus, aut differemus justitiam, vel rectum."[3]

---

2. The plaintiff alleges that there was a two-level increase in his security classification, because there were two levels within the "medium" classification and he had been placed in the lower of those levels; when he was moved up to the "close" category, his security classification was therefore increased by two levels. The state defendants deny that there was a two-level increase; they say that the plaintiff had never

actually been placed in the lower level of the "medium" classification.

3. Professor Plucknett provides this translation: "No freeman shall be taken or imprisoned, or disseised of his free tenement, liberties or free customs, or outlawed or exiled or in any wise destroyed, nor will we go upon him, nor will we send upon him, unless by the lawful

The plaintiff's reliance on Magna Carta is misplaced. The plaintiff was not a "free man" at the time of his reclassification and transfer, and no one could possibly have imagined that King John, in placing his seal upon the Great Charter at Runnymede, was consenting to limitations on his power to upgrade security classifications for convicted murderers. If the plaintiff had been convicted of murder in one of the king's courts in 13th Century England, indeed, his security classification could not possibly have been a live issue for very long; the judgment in such cases, as Bracton tells us, was that the defendant "suspendatur per collum, quousque mortuus fuerit." Bracton lib. 3, fol. 104. As a matter of history, therefore, any punishment short of death by hanging would have given the defendant more than his due.

As a matter of current constitutional law, there are contexts in which it is widely believed that one's substantive due process rights may be violated by conduct that "shocks the conscience," see *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), and offends "those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Id.* at 169, 72 S.Ct. at 208, quoting *Malinski v. New York,* 324 U.S. 401, 416–17, 65 S.Ct. 781, 788–89, 89 L.Ed. 1029 (1945). *Cf. Wilson v. Beebe,* 770 F.2d 578, 586 (6th Cir.1985) (*en banc*).[4] The procedure through which the plaintiff in this case was reclassified and assigned to another prison certainly does not shock our conscience, if that be thought relevant, nor does the procedure offend any canons of decency and fairness of which we are aware.

*B.   The Dismissal of the Claim Against Congressman Schuette.*

The final count of the plaintiff's first amended complaint alleged that "Defendant SCHUETTE is liable ... due to his participation in a conspiracy to violate the Plaintiff's Fifth and Fourteenth Amendment Rights." The claim is baseless.

In 42 U.S.C. § 1985(3)—the statute under which the conspiracy claim must be analyzed—Congress created a cause of action against

"persons [who] ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws...."

■■■ To state a claim under § 1985(3), a complaint must allege both a conspiracy and some "class-based discriminatory animus behind the conspirators' action." *Dunn v. Tennessee,* 697 F.2d 121, 124 (6th Cir.1982) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)), *cert. denied,* 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983). The amended complaint filed by the plaintiff in the case at bar contained no allegation of any "class-based discriminatory animus," and we have been given no reason to suppose that any such animus existed.

In writing to the Department of Corrections on behalf of his constituent, the daughter of one of the plaintiff's victims, Congressman Schuette was simply providing the kind of "constituent service" that every member of Congress renders routine-

---

judgment of his peers, or by the law of the land. To none will we sell, deny, or delay right or justice." Plucknett, A Concise History of the Common Law, p. 24 (5th Ed.1956).

**4.** Where a claim can be analyzed under a constitutional provision that "provides an explicit textual source of constitutional protection," however, it is the explicit provision, "not the more generalized notion of 'substantive due process,'" under which the claim must be analyzed. *Gra-*

*ham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). "Applying the 'shock the conscience' test in an area other than excessive force," it has been said, "is problematic." *Braley v. City of Pontiac,* 906 F.2d 220, 226 (6th Cir.1990) (separate opinion of Boggs, J.), quoted with approval in *Cassady v. Tackett,* 938 F.2d 693, 698 (6th Cir.1991), and *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1217 (6th Cir.1992).

ly upon request. For the federal judiciary to subject members of Congress to liability for simply doing their jobs would be unthinkable. *Cf. United States v. Ford*, 830 F.2d 596, 601 (6th Cir.1987), where Judge Merritt observed that

> "the doctrine of separation of powers—a unique feature of our constitutional system designed to insure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communication between a congressman and his constituents. It would tend to undermine the representative nature of the democratic process and the legislator's responsibility to the electorate to account for his actions."

It bears emphasis that there was nothing secret about Congressman Schuette's letter, and the plaintiff was afforded the opportunity—of which he availed himself—to appear before two high-level prison officials and explain to them why he did not believe that the course of action recommended by the congressman would be a good idea. Against this background, it is particularly difficult for us to understand how the congressman's letter could be thought to have violated any constitutional right of the plaintiff.

### III

■ The final question we must decide is whether the district court abused its discretion in declining to allow the filing of a second amended complaint that would have set forth claims purporting to be based on the Equal Protection Clause of the Fourteenth Amendment and on Article I, Section 10, which prohibits a state from passing a bill of attainder. No abuse of discretion occurred, in our view, because the new claims that the plaintiff wanted to assert would have been subject to dismissal if the second amended complaint had been filed.

■ As the district court correctly observed, the plaintiff could not make out a violation of his equal protection rights simply by showing that other inmates were treated differently. He would have to show that he "was victimized because of some suspect classification, which is an essential element of an equal protection claim." *Booher v. United States Postal Service*, 843 F.2d 943, 944 (6th Cir.1988). No such showing was possible here.

■ The bill of attainder claim was equally without merit.

"A bill of attainder is 'a legislative act which inflicts punishment on named individuals or members of an easily ascertainable group without a judicial trial.' *United States v. O'Brien*, 391 U.S. 367, 383 n. 30, 88 S.Ct. 1673, 1682 n. 30, 20 L.Ed.2d 672 (1968). 'The proscription against bills of attainder reaches only statutes that inflict punishment on the specified individual or group.' *Selective Serv. Sys. v. Minnesota Pub. Interest Group*, 468 U.S. 841, 851, 104 S.Ct. 3348, 3354, 82 L.Ed.2d 632 (1984)." *Gardner v. City of Columbus*, 841 F.2d 1272, 1278 (6th Cir.1988).

As Judge Duggan correctly concluded, no bill of attainder was passed here. "[A]ssuming *arguendo* that the Bill of Attainder Clause applies to administrative rulemaking, plaintiff does not claim that state officials enacted any rules for the purpose of punishing him without a judicial trial." Slip Opinion at 6.

The judgment of the district court is AFFIRMED.