**James KOOS, Petitioner,**

v.

**Michael HOLM, Respondent.**

No. 02–2151–D/V.

United States District Court,
W.D. Tennessee,
Western Division.

May 31, 2002.

---

James T. Koos, Whiteville, TN, pro se.

ORDER DENYING INJUNCTION TO PREVENT TRANSFER ORDER DENYING MOTION TO RENOUNCE CITIZENSHIP ORDER DENYING MOTION FOR DEPORTATION ORDER DENYING MOTION FOR ATTENDANCE ORDER DENYING MOTION FOR APPOINTMENT OF COUNSEL ORDER DENYING MOTION FOR PROSPECTIVE INJUNCTIVE RELIEF ORDER OF DISMISSAL ORDER DENYING CERTIFICATE OF APPEALABILITY AND ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

DONALD, District Judge.

Petitioner, James Koos, an inmate at the West Tennessee Detention Facility

(WTDF), has filed irregular documents with the Court. The WTDF, which is owned by Corrections Corporation of America, is a privately operated penal facility in Mason, Tennessee. WTDF houses federal pre-trial detainees under a contract with the United States Marshal Service and state inmates under contracts with individual jurisdictions. The petitioner has paid the filing fee of five dollars, the correct amount for a habeas petition.

The Clerk of Court is directed to record the respondent as Michael Holm.[1] The Clerk of Court shall not issue any process.

Petitioner alleges that he is improperly confined at the WTDF. Although the irregular documents are somewhat vague on the exact nature of the relationship between petitioner's current custodian and the State of Wisconsin, this Court is well aware from numerous prior lawsuits in this district that CCA houses Wisconsin prisoners at WTDF under a contract with the Wisconsin Department of Corrections (WDOC). Petitioner contends that by transferring him to a private prison outside the state of Wisconsin, Wisconsin has waived any jurisdiction over him, entitling him to unconditional release. Additionally, petitioner filed a motion requesting that this Court direct the United States Attorney General to allow plaintiff to renounce his United States citizenship and to deport him to his country of choice.

Since Wisconsin contracted with CCA to house its prisoners, this Court has had occasion well over a dozen times to consider claims that the transfer of a Wisconsin prisoner from an institution operated by the Wisconsin Department of Corrections to a CCA prison in another state abrogates

the original sentence and entitles the prisoner to release. This Court has uniformly rejected these claims. *See, e.g., Donaldson v. Figeuroa,* No. 00–1215 (W.D.Tenn. July 31, 2000); *Smith v. Pitzer,* No. 00–1170 (W.D.Tenn. June 19, 2000); *Washington v. Pitzer,* No. 00–1151 (W.D.Tenn. May 26, 2000); *Day v. Pitzer,* No. 00–1140 (W.D.Tenn. May 19, 2000); *Eastman v. Holm,* No. 00–2383–D/V (W.D.Tenn. May 9, 2000); *Edmonds v. Holm,* No. 00–2199–G/Bre (W.D.Tenn. Mar. 14, 2000); *Page v. Pitzer,* No. 99–1328 (W.D.Tenn. Dec. 30, 1999); *Belton v. Pitzer,* No. 99–1311 (W.D.Tenn. Nov. 23, 1999); *Sanders v. Pitzer,* No. 99–1290 (W.D.Tenn. June 19, 2000); *Nickl v. Pitzer,* No. 99–1198 (W.D.Tenn. Sept. 2, 1999); *Sturdevant v. Pitzer,* No. 99–1189 (W.D.Tenn. Sept. 2, 1999); *Eckert v. Pitzer,* No. 99–1189 (W.D.Tenn. July 30, 1999); *McClain v. Pitzer,* No. 99–1072 (W.D.Tenn. Apr. 28, 1999); *Schaitel v. Pitzer,* No. 99–1034 (W.D.Tenn. Feb. 22, 1999).

■ Since Koos asserts a right to complete release from confinement, he seeks relief that is only available through a petition for a writ of habeas corpus. *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Insofar as the waiver theory that has been repeatedly rejected by this Court, the Court will repeat the analysis here. An inmate does not have a liberty interest in assignment to a particular institution. *Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 224–25, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Moody v. Daggett,* 429

---

1. Petitioner listed the no respondent on the document entitled "petition for writ of habeous [sic] corpus." As explained, *infra,* petitioner paid the filing fee and this document must be construed as a habeas petition. The only proper respondent to a habeas petition is

the prisoner's custodian. Accordingly, the Clerk shall delete any reference to the United States Justice Department and the Immigration and Naturalization Service, Memphis office as respondents.

U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976); *Newell v. Brown*, 981 F.2d 880, 883 (6th Cir.1992); *Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir.1986). In *Wolff v. McDonnell*, 418 U.S. 539, 564–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court identified the procedural requirements prison officials must adopt to satisfy due process when depriving a prisoner of various liberty interests, including deprivation of sentence credits and confinement to segregation. In *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Court limited the *Wolff* requirements applicable to purely administrative, rather than punitive segregation, but broadened the scope of federal court authority over prison administration by recognizing that the mandatory language of state regulations could create liberty interests protected by due process requirements. Courts were required to consider whether "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State [or federal government] has created a protected liberty interest." *Hewitt*, 459 U.S. at 472, 103 S.Ct. 864. In *Sandin v. Conner*, 515 U.S. 472, 484–87, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), however, the Court rejected *Hewitt* and much of the lower-court jurisprudence that relied on *Wolff.* Without explicitly overruling *Hewitt* itself, *Sandin* returned to the question left open in *Wolff*, 418 U.S. at 564–71, 94 S.Ct. 2963: whether inmates even have a liberty interest in freedom from segregation, punitive or administrative. The Court rejected *Hewitt's* methodology and concluded that they do not.

> The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff*, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. *See also Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, *see, e.g., Vitek[ v. Jones*, 445 U.S. 480,] 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 [ (1980) ] (transfer to mental hospital), and *Washington[ v. Harper*, 494 U.S. 210,] 221–222, 110 S.Ct. 1028, 108 L.Ed.2d 178 [ (1990) ] (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.
>
> Conner asserts, incorrectly, that any state action taken for a punitive reason encroaches upon a liberty interest under the Due Process Clause even in the absence of any state regulation. Neither *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), nor *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), requires such a rule. . . . We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. . . . We hold, therefore, that neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded Conner a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff.* The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life.

*Sandin*, 515 U.S. at 483–84, 486, 487, 115 S.Ct. 2293 (footnotes and some citations omitted).

*Sandin* thus focuses not on the content of regulations, but on the "nature of the deprivation" visited upon the inmate. *Id.* at 481, 115 S.Ct. 2293. Absent "atypical and significant hardship," a change in the conditions of confinement simply does not inflict a cognizable injury that merits constitutional protection, regardless of the motivation of the official when making the change. *Id.* at 484–86, 115 S.Ct. 2293. Thus language in state laws or prison regulations no longer creates a liberty interest protected by the Due Process Clause. *Rimmer–Bey v. Brown,* 62 F.3d 789, 790–91 (6th Cir.1995). Rather, from now on, when analyzing due process claims federal courts look neither to state laws or regulations to ascertain whether they create a liberty interest in connection with a housing assignment, imposition of disciplinary penalties, reclassification, or a prison transfer, nor to the subjective motives of prison officials for effecting such changes. Instead, the Court focuses on the nature of the deprivation itself.

After [*Sandin* ], prisoners may no longer peruse state statutes and prison regulations searching for the grail of limited discretion. Instead, a prisoner has a liberty interest only in "freedom[s] from restraint ... impos[ing] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2294.

*Orellana v. Kyle,* 65 F.3d 29, 31 (5th Cir. 1995). According to *Orellana,* only deprivations that clearly impinge on the *duration* of confinement, will henceforth even possibly qualify for constitutional "liberty" status. *Id.* at 31–32.

■ Under *Sandin,* the allegation that petitioner was transferred to and confined at WTDF does not amount to an allegation of "atypical and significant hardship" "in relation to the ordinary incidents of prison life" and thus does not allege the deprivation of any liberty interest. *See, e.g.,*

*Mackey v. Dyke,* 111 F.3d 460, 462–63 (6th Cir.1997). This conclusion is clear from *Sandin's* reliance on *Wakinekona,* 461 U.S. at 249–50, 103 S.Ct. 1741, in which the Court held that an inmate's transfer to California from a Hawaii prison did not work a substantial hardship or deprive him of a constitutional right. If a six-thousand mile transfer is not atypical and significant, neither is a seven-hundred mile transfer from Wisconsin to Mason, Tennessee. Moreover, petitioner's theory that Wisconsin has waived its jurisdiction over him by contracting with CCA to house him outside of his state of conviction obviously fails in light of *Wakinekona. See also Pischke v. Litscher,* 178 F.3d 497, 500 (7th Cir.1999) (explaining inapplicability of any "provision of the Constitution that might be violated by the decision of a state to confine a convicted prisoner in a prison owned by a private firm rather than by a government"). As *Pischke* holds "[a] prisoner has a legally protected interest in the conduct of his keeper, but not in the keeper's identity." *Id.* (citing *Wakinekona* ).

It is a popular myth among prisoners that a state's authority over a prisoner ends at the state's geographical border. This myth appears to have sprung from a few cases early in this century in which either state corrections departments "forgot" about prisoners while they were serving terms in other jurisdictions and did not reclaim them when the other state paroled them, or two jurisdictions repeatedly shuttled a prisoner back and forth, or the prison or jail official attempted to reconfine a prisoner after an earlier mistaken release not based on mere clerical or ministerial error. Many of the cases that at first glance seem to enunciate a general principle in fact are merely indulging in *dicta.* Furthermore, most of the cases are concerned with refuting waiver arguments of the sort raised by prisoners such as Koos.

Thus, in *White v. Pearlman*, 42 F.2d 788, 789 (10th Cir.1930), a federal court sentenced Pearlman, in March of 1925, to five years in prison. Pearlman obediently went off to serve his term, but only a little over a year later, in June of 1926, the warden insisted over Pearlman's protests that he was only serving three years and that his term was about to expire. Pearlman obediently left and apparently lived in peace with the world for about two years before federal authorities notified him that a mistake had been made, and that he had to finish his sentence. Pearlman again followed the law and returned to prison. Upon the expiration of five years from the date his sentence originally began, however, he filed a habeas petition contending that his sentence was over. The Court held that Pearlman's federal sentence had continued to run while he was released because he did not cause the release, was innocent of any wrongdoing during the release period, and could not be blamed if the warden made a mistake.

*Pearlman* provided the basis for a later decision that involved an even more egregious delay, although the plaintiff was less sympathetic.

This is an appeal by Jack Shields from denial of habeas corpus. Appellant was convicted in Gray County, Texas, for two felonies, on May 18 and 19, 1933, respectively, and sentenced to 10 years' imprisonment in each case to run consecutively. On November 28, 1933, he was convicted in Wheeler County, Texas, for a felony and sentenced to an additional term of 20 years to run consecutively to the first two convictions, a total of 40 years. On December 5, 1934, after serving slightly more than 1 year of his 40-year term, the Governor of Texas granted Shields a 60-day "furlough." Texas prison officials notified Louisiana authorities of the "furlough" because Shields had escaped from a Louisiana penitentiary prior to the Tex-

as convictions. Instead of taking the furlough, Shields signed a waiver of extradition and began serving time in the Louisiana penitentiary, from which he was paroled on June 2, 1944. Parole supervision was removed on April 7, 1948. Texas did not place a detainer for Shields at the Louisiana penitentiary, and he was released and remained at large until May 12, 1960, when he was convicted in a federal district court in Tennessee and sentenced to 5 years, from which he was paroled on May 12, 1962. He was then transferred to Jasper County, Texas, where, 28 years after he was first extradited by Texas to Louisiana, he was convicted of passing a forged instrument and sentenced to a term of 2 years plus the time not served as of December 5, 1934 on the 1933 convictions in Texas, an additional period of approximately 39 years.... The question we must decide is whether after more than 28 years of inaction on the part of the State of Texas relative to the unexpired term of Shields's 1933 convictions, he may now on conviction of a new felony in Texas be required to serve the balance of time on these old sentences. Do the circumstances of this case, therefore, offend the constitutional precepts of due process stated in the Fourteenth Amendment? ... The lack of interest in Shields by the State of Texas from the date he was released to the Louisiana authorities in 1934 until 1962 when again convicted in Texas, a lapse of more than 28 years, was equivalent to a pardon or commutation of his sentence and a waiver of jurisdiction. The Jasper County state judge, therefore, lacked authority to require Shields to complete service of the sentences under the old 1933 convictions, which action constituted a denial of due process under the Fourteenth Amendment to the United States Constitution.

*Shields v. Beto,* 370 F.2d 1003–04, 1006 (5th Cir.1967). *Shields* appears to be a unique decision in this area.

In another early case, *Ex Parte Youstler,* 40 Okla.Crim. 273, 268 P. 323, 324 (1928), an Oklahoma prisoner protested that he could not be made to serve his sentence because Oklahoma had previously transferred him to Missouri and allowed that state to confine him first. The Oklahoma court held that, assuming that the state's decision to transfer the prisoner waived jurisdiction for purposes of demanding his return, the prisoner could not protest serving a validly imposed sentence once he was back in Oklahoma custody.

In another Oklahoma case, *Ex parte Eley,* 9 Okla.Crim. 76, 130 P. 821 (Okla. Crim.App.1913), a sheriff released a misdemeanant shortly into a fifty-five day sentence, erroneously telling him that the Court had ordered his release. After the time during which the sentence would have ended if the prisoner had been continuously confined, the sheriff attempted to force him to serve the remainder of the sentence. The Court held that the sentence had already expired.

These types of cases enunciate a general waiver principle, but the petitioner gains no help from them. Moreover, later jurisprudence has universally limited the older cases to their peculiar facts. Thus, in *Piper v. Estelle,* 485 F.2d 245, 246 (5th Cir.1973), the Court stated that

> In cases based upon the principles of *Shields* it is not sufficient to prove official conduct that merely evidences a lack of eager pursuit or even arguable lack of interest. Rather the waiving state's action must be so affirmatively wrong or its inaction so grossly negligent that it would be unequivocally inconsistent with "fundamental principles of liberty and justice" to require a legal sentence to be served in the aftermath of such action or inaction.... Piper also argues that

*Shields* is applicable any time one sovereign surrenders a prisoner to another sovereign while the prisoner is serving a sentence of the surrenderer. Even assuming such a holding would somehow raise issues of constitutional dimensions, *Shields* establishes no per se rule which substitutes for analysis of the facts of each case in light of the requirements of due process.

485 F.2d at 246.

Some cases refer to a supposed common law doctrine that "a prison sentence runs continuously from the date on which the defendant surrenders to begin serving it." *Dunne v. Keohane,* 14 F.3d 335, 336 (7th Cir.1994). The theory at work is that a transfer between different sovereigns operates to interrupt one sentence and terminate it. While, however, there are myriad cases citing this principle in the abstract, there are none applying it favorably to a prisoner. *See, e.g., Dunne; Moses v. O'Dea,* No. 93–5150, 1993 WL 206069 (6th Cir. June 11, 1993); *Tucker v. Henman,* No. 91–3205, 1992 WL 33249 (10th Cir. Feb.18, 1992); *Blango v. Thornburgh,* 942 F.2d 1487, 1491 (10th Cir.1991) (holding that District of Columbia did not waive jurisdiction by transferring prisoner to United States Penitentiary at Leavenworth, Kansas); *United States v. Dovalina,* 711 F.2d 737, 739 (5th Cir.1983); *Causey v. Civiletti,* 621 F.2d 691, 694 (5th Cir.1980); *Cox v. United States,* 551 F.2d 1096, 1099 (7th Cir.1977); *Hanks v. Wideman,* 434 F.2d 256, 257 (5th Cir.1970) (holding federal prisoner prosecuted in federal court under writ of habeas corpus *ad prosequendum* and later returned to federal custody after completing state sentence had no claim, based on marshal's mistaken delivery of him after imposition of federal sentence to federal prison for three weeks before return to state prison, that United States had waived jurisdiction over him); *Thompson*

*v. Bannan*, 298 F.2d 611, 612 (6th Cir. 1962) (pre-trial extradition of Michigan prisoner for trial in Illinois did not waive Michigan's jurisdiction and prohibit his return for trial after Illinois acquittal); *Johnson v. West Virginia*, 679 F.Supp. 596, 598 (S.D.W.Va.1988). *Cf. White v. Duval*, No. 94–1647, 1994 WL 386868 (1st Cir. July 26, 1994) (return of prisoner from South Carolina to Massachusetts did not waive right of South Carolina to reincarcerate prisoner upon completion of Massachusetts sentence); *Dellelo v. Ponte*, Nos. 93–1232, 93–1117, 1993 WL 355169 (1st Cir. Sept.14, 1993) (temporary transfer of nearly four years from state to federal prison did not deprive state of jurisdiction over prisoner). *Cf. Lipscomb v. Stevens*, 349 F.2d 997, 1001 (6th Cir. 1965) (Bureau of Prisons did not waive jurisdiction over prisoner serving concurrent state and federal sentences who was transferred back and forth between state and federal prisons over three-year period).

The sense of this entire body of caselaw is that a prisoner simply has no right to complain if the state decides to house him outside its borders, or even if he is actually transferred between various jurisdictions, each of which has convicted him. Only when a prisoner is released for some time through no fault of his own has there ever even been a question raised about a possible due process violation.

In this case, Koos has no such claim. He clearly has not been released. Equally clearly, he has not even been transferred to the custody of another sovereign. The State of Wisconsin has simply contracted to house him outside its boundaries. None of the above cases address private contracts, and an extensive canvassing of caselaw involving the transfer and removal of prisoners outside the convicting state's boundaries reveals no support for any jurisdictional waiver theory. *See Pischke* (holding no Constitutional support for analogous Thirteenth Amendment attack on private housing of state prisoners and stating explicitly: "Let Wisconsin prisoners have no doubt of the complete lack of merit of their ... claims").

To the extent that the petition should be construed as contending that Wisconsin's state constitution, statutes, or rules prohibit transporting Wisconsin inmates outside the state, he has no claim. Petitioner does not enjoy a federal constitutional right in confinement within Wisconsin, regardless of that state's statutes or prison regulations.

> [A]n inmate's "subjective expectations [are not] dispositive of the liberty interest analysis." *Sandin*, 515 U.S. at 486 n. 9[, 115 S.Ct. 2293]. Rather, the *Sandin* standard invokes a comparison of the punitive restraint with what an inmate can expect from prison life generally to determine whether there has resulted an "atypical, significant deprivation," *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir.1995), which presents "dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman v. Thalacker*, 83 F.3d 970, 972 (8th Cir.1996).

*Wilson v. Harper*, 949 F.Supp. 714, 721 (N.D.Iowa 1996) (citation form updated).

As petitioner has not alleged any atypical and significant hardship, he has failed to allege the deprivation of a federally recognized liberty interest, and is not entitled to any of the procedural protections enunciated in *Wolff* or its progeny. He has no due process claim, either substantive or procedural.

Having determined that Koos is not entitled to release, the Court turns to his next irregular motions. Koos seeks an order directing the Attorney General of the United States to allow Koos to renounce his citizenship and deport him to

the country of his choice. Koos seeks an order preventing WDOC and CCA from transferring him outside this district. Koos seeks an order preventing WDOC, CCA, and the United States Department of Justice from delaying, detaining, or harassing Koos should the Court grant him the requested relief.

 To the extent plaintiff requests that this Court prevent his transfer outside this district, this Court does not have the authority to supervise state classification and assignment of inmates. As stated previously, an inmate in state custody does not have a protected right to be housed in a particular institution. *Olim v. Wakinekona,* 461 U.S. at 245, 103 S.Ct. 1741; *Meachum v. Fano,* 427 U.S. at 224–25, 96 S.Ct. 2532; *Montanye v. Haymes,* 427 U.S. at 243, 96 S.Ct. 2543; *Moody v. Daggett,* 429 U.S. at 88 n. 9, 97 S.Ct. 274; *Newell v. Brown,* 981 F.2d at 883; *Beard v. Livesay,* 798 F.2d at 876. Thus, Koos' motion for an injunction preventing transfer is DENIED.

 A citizen has the right to renounce his citizenship. *Nishikawa v. Dulles,* 356 U.S. 129, 139, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958). One of the most obvious and effective forms of expatriation has been that of naturalization under the laws of another nation. However, due to the common-law prohibition of expatriation without the consent of the sovereign, courts hesitated to recognize expatriation of citizens, even by foreign naturalization, without the express consent of our Government. *Savorgnan v. United States,* 338 U.S. 491, 498, 70 S.Ct. 292, 94 L.Ed. 287 (1950). Congress has broad authority over the conditions and procedures which must be satisfied to expatriate. *Davis v. District Director, INS,* 481 F.Supp. 1178, 1183–84 n. 8 (D.D.C.1979); *Tomasicchio v. Acheson,* 98 F.Supp. 166, 169 (D.D.C.1951). The current statute governing voluntary renunciation of citizenship provides:

(a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality—

(1) obtaining naturalization in a foreign state upon his own application, or upon an application filed by a duly authorized agent after having obtained the age of eighteen years; or

(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof after having attained the age of eighteen years; or

(3) entering, or serving in, the armed forces of a foreign state if (A) such armed forces are engaged in hostilities against the United States, or (B) such persons serve as a commissioned or non-commissioned officer; or

(4)(A) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, if he has or acquires the nationality of such foreign state; or (B) accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof after attaining the age of eighteen years, if he has or acquires the nationality of such foreign state; or

(5) making a formal renunciation of nationality before diplomatic or consular officer of the United States in foreign state, in such form as may be prescribed by the Secretary of State; or

(6) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, **when-**

**ever the United States shall be in a state of war** and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; or

(7) committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States, violating or conspiring to violate any of the provisions of section 2383 of Title 18, or willfully performing any act in violation of section 2385 of Title 18, or violating section 2384 of Title 18 by engaging in a conspiracy to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, if and when he is convicted thereof by a court martial or by a court of competent jurisdiction.

(b) Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after September 26, 1961 under, or by virtue of, the provisions of this chapter or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. Any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this chapter or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

8 U.S.C.A. § 1481 (emphasis added).

Koos has attached a copy of his letter to the United States Attorney General expressing his desire to renounce his citizenship under § 1481(a)(6). He alleges that the United States is in a "time of war" and requests that the assigned designees be sent to the prison to execute the proper forms. Contrary to Koos' belief, the Unit-

ed States is not in a state of war and § 1481(a)(6) is presently inoperative. *United States Citizenship and Naturalization Handbook,* § 15:13. RENUNCIATION INSIDE U.S. Thus, the Attorney General has not prescribed procedures for such renunciations. *Id.*

█ Koos may renounce his citizenship by following any other provision of § 1481. The attached letter of the officer in charge of the United States Department of Justice Immigration and Naturalization Service, Memphis Sub–Office contains the suggestion that Koos travel to a country mentioned in his letter and formally renounce his citizenship to a United States Consular Officer. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Hewitt,* 459 U.S. at 467, 103 S.Ct. 864; *Bell,* 441 U.S. at 546, 99 S.Ct. 1861; *Wolff,* 418 U.S. at 56. The courts have repeatedly held that association with other persons, regardless of the constitutional source of the protection of that activity, is necessarily restricted as an incidental and inevitable result of incarceration. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (enunciating general principle that incarceration necessarily restricts an inmate's personal freedoms, particularly associational freedoms). After Koos fully serves his sentence, he is free to travel to another country and renounce his citizenship to a United States Consular Officer. As he is a prisoner at this time, he may not exercise this right. Accordingly, Koos' motion for an order allowing him to renounce his citizenship is DENIED.

█ Koos fails to appreciate that he has no right to an order of deportation even should he become an alien while incarcerated. Section § 241(a)(4)(D), 8 U.S.C. § 1231(a)(4)(D), provides that "[n]o cause

or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien." Thus, courts have uniformly held that no alien has an individual right to compel the Attorney General or the INS to deport him. *See, e.g., Prieto v. Gluch,* 913 F.2d 1159 (6th Cir.1990); *Thye v. United States,* 109 F.3d 127 (2d Cir.1997) (*per curiam* ); *Hernandez–Avalos v. Immigration & Naturalization Serv.,* 50 F.3d 842 (10th Cir.1995); *Campos v. Immigration & Naturalization Serv.,* 62 F.3d 311 (9th Cir.1995); *Giddings v. Chandler,* 979 F.2d 1104 (5th Cir. 1992); *Aguirre v. Meese,* 930 F.2d 1292 (7th Cir.1991) (*per curiam* ); *see also Urbina–Mauricio v. Immigration & Naturalization Serv.,* 989 F.2d 1085, 1088 (9th Cir.1993). This Court lacks the authority to issue a deportation order. *United States v. Quaye,* 57 F.3d 447, 449–50 (5th Cir.1995); *United States v. Jalilian,* 896 F.2d 447 (10th Cir.1990); *United States v. Abushaar,* 761 F.2d 954, 958–61 (3d Cir. 1985); *United States v. Hernandez,* 588 F.2d 346, 350–52 (2d Cir.1978); *see Wong Wing v. United States,* 163 U.S. 228, 236–37, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (noting, *in dicta,* that it is constitutional for Congress to delegate the authority to deport aliens to the executive branch). The motion for an order directing the Attorney General to deport him is also DENIED. If and when Koos satisfies his obligation to the citizens of the State of Wisconsin, however, he may travel at his own expense to the country of his choice and renounce his citizenship.

Under 28 U.S.C. § 2254(a), a district court may entertain "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." The threshold question in any federal ha-

beas petition, therefore, is whether the petition even raises such claims. *See, e.g., Tillett v. Freeman,* 868 F.2d 106, 108 (3d Cir.1989); *Martin v. Solem,* 801 F.2d 324, 331 (8th Cir.1986); *Nelson v. Solem,* 714 F.2d 57, 60 n. 2 (8th Cir.1983); *Hall v. Iowa,* 705 F.2d 283, 287 (8th Cir.1983). As the petitioner has failed to assert any claim implicating a federal constitutional right, he has no basis for federal habeas relief.

Therefore, as it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," summary dismissal prior to service on the respondent is proper. Rule 4, Rules Governing Section 2254 Cases in the United States District Courts. This petition is therefore DISMISSED. As the petition is dismissed, Koos' motion for attendance at all proceedings, motion for appointment of counsel, and motion for prospective injunctive relief are DENIED as MOOT.

■ The Court must also determine whether to issue a certificate of appealability. Twenty-eight U.S.C. § 2253(c) provides:

(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

 (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

 (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which spe-

cific issue or issues satisfy the showing required by paragraph (2).

*Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir.1997), held that district judges may issue certificates of appealability under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 102, 110 Stat. 1220 (Apr. 24, 1996). The Court also held that the AEDPA codifies in amended § 2253 the standard for issuing a certificate of probable cause found in prior § 2253, which was essentially a codification of *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). *See Lyons*, 105 F.3d at 1073.

> [P]robable cause requires something more than the absence of frivolity ... and the standard for issuance of a certificate of probable cause is a higher one than the 'good faith' requirement of § 1915.... [A] certificate of probable cause requires petitioner to make a substantial showing of the denial of [a] federal right. [A] question of some substance, or a substantial showing of the denial of [a] federal right, obviously [does not require] the petitioner [to] show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.

*Barefoot*, 463 U.S. at 893, 103 S.Ct. 3383 (internal quotations and citations omitted). In this case, the petitioner's claims are clearly devoid of arguable merit and he

cannot present a question of some substance about which reasonable jurists could differ. The Court therefore denies a certificate of appealability.

■ To seek leave to appeal *in forma pauperis* in a § 2254 case, and thereby avoid the $105 filing fee required by 28 U.S.C. §§ 1913 and 1917,[2] the petitioner must seek permission from the district court under Rule 24(a) of the Federal Rules of Appellate Procedure (F.R.A.P.). *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir.1997). If the motion is denied, the petitioner may renew the motion in the appellate court.

F.R.A.P. 24(a) states, in pertinent part that:

> A party to an action in a district court who desires to proceed on appeal *in forma pauperis* shall file in the district court a motion for leave to so proceed, together with an affidavit, showing, in the detail prescribed by Form 4 of the Appendix of Forms, the party's inability to pay fees and costs or to give security therefor, the party's belief that that party is entitled to redress, and a statement of the issues which that party intends to present on appeal.

The Rule further requires the district court to certify in writing whether the appeal is taken in good faith, and to deny the certificate if the appeal would be frivolous. In this case, the petitioner has no rational basis for contending that he is entitled to release or deportation. Any arguments he might present on appeal to the contrary would lack even arguable merit. The Court thus determines that

---

**2.** The fee for docketing an appeal is $100. *See* Judicial Conference Schedule of Fees, ¶ 1, Note following 28 U.S.C. § 1913. Under 28 U.S.C. § 1917, a district court also charges a $5 fee:

> Upon the filing of any separate or joint notice of appeal or application for appeal or

upon the receipt of any order allowing, or notice of the allowance of, an appeal or of a writ of certiorari $5 shall be paid to the clerk of the district court, by the appellant or petitioner.

any appeal in this case would not be taken in good faith. It is therefore certified, pursuant to F.R.A.P. 24(a), that any appeal in this matter by this petitioner is not taken in good faith and he may not proceed on appeal *in forma pauperis*.